**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
SKYE RESENDES (278511)
*skye@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

**KREINDLER & KREINDLER, LLP**
GRETCHEN M. NELSON (112566)
*gnelson@kreindler.com*
707 Wilshire Boulevard, Suite 3600
Los Angeles, California 90017
Telephone: (213) 622-6469
Facsimile: (213) 622-6019

**GOMEZ TRIAL ATTORNEYS**
JOHN H. GOMEZ (171485)
*jgomez@gomeztrialattorneys.com*
DEBORAH S. DIXON (248965)
*ddixon@gomeztrialattorneys.com*
655 W. Broadway Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
Facsimile: (619) 237-3496

*Class Counsel*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| KIM ALLEN, et al., on behalf of themselves, all others similarly situated and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>HYLAND'S, INC., et al.,<br><br>Defendants. | Case No: 12-cv-1150-DMG-MAN<br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' TRIAL BRIEF**<br><br>Judge: Honorable Dolly M. Gee<br>Trial Date: September 1, 2015 |

*Kim Allen et al. v. Hyland's, Inc. et al.*, Case No. 12-cv-1150
PLAINTIFFS' TRIAL BRIEF

## I. INTRODUCTION

Plaintiffs respectfully submit their Trial Brief to aid the Court in its effective administration of justice. Plaintiffs do so with three goals in mind: (1) to simplify and shorten these trial proceedings as much as possible; (2) to assist the Court in determining best how to adjudicate these mixed legal and equitable claims; and (3) to clarify in advance how Plaintiffs intend to prove their claims. Plaintiffs otherwise commit to presenting their claims clearly, expeditiously and civilly.

## II. PLAINTIFFS PROPOSE TO SIMPLIFY AND SHORTEN TRIAL

Plaintiffs value the resources of the Court and the time of the jury. Therefore, Plaintiffs propose to simplify and shorten trial as much as possible.

### A. Plaintiffs Do Not Believe the Parties Need a Full 14 Days

While the Court has imposed limits of 14 trial days (28 hours each side, exclusive of opening and closings)[1], Plaintiffs will endeavor to get this case to the jury as efficiently as possible. Plaintiffs believe they can present their liability case, in its entirety, in less than **6 trial days**. Included in that estimate is the testimony of Defendants' CEO, Dr. John P. Borneman. Defendants have indicated that they will not recall Dr. Borneman in their case, but will present his testimony in whole during Plaintiffs' case. Given the Court's *in limine* rulings regarding cumulative expert testimony, Plaintiffs now realistically believe that Defendants' case should take three trial days at the very most. As such, the original trial estimate has been significantly reduced.

### B. Bifurcation of Liability and Damages Evidence and Claims Makes Efficiency Sense and Will Prevent Prejudice

On August 4, 2014, the Court, *sua sponte*, raised the issue of bifurcation of trial to the parties. In the interest of efficiency, and to prevent any unfair prejudice to either party, Plaintiffs agree to bifurcation of all liability and damages evidence

---

[1] Doc. No. 382, Final Pretrial Conference Order.

and claims. In a Joint Status Report filed August 14, 2015, Plaintiffs proposed bifurcation. Doc. No. 379. In the same filing, Defendants opposed bifurcation, arguing:

> Indeed, Plaintiffs' proposal would only create more work. In bifurcating the liability and damages portions of the trial, Plaintiffs would have the parties delivering multiple closing arguments and the jury would deliberate twice. This would necessarily eliminate any time savings should the jury find for Plaintiffs on liability. Further, relegating the punitive damage issue to a second phase of the trial could inconveniently require the recall of witnesses such as Defendants' CEO, Dr. John P. Borneman, and other employees of Defendants who are also traveling from outside California so that Plaintiffs can attempt to establish malice or fraud in phase two of a bifurcated trial.

Doc. No. 379 at p. 2.

Defendants fundamentally misunderstand Plaintiffs' proposal. Plaintiffs propose to try all liability issues in phase one, including whether Defendants acted with "malice" or "fraud" sufficient to justify punitive damages. The second phase would involve compensatory and (if necessary) punitive damages only. Plaintiffs will not recall any of Defendants' employees during a second phase and would rely only upon financial documents and Plaintiffs' retained economist Dr. William Ackerman. Plaintiffs will not recall Mr. Borneman during the second phase of trial.

Bifurcation makes sense for a number of additional reasons. First, and obviously, unless Plaintiffs prevail during the first phase, no damage evidence or argument will be necessary at all, including at least two expert witnesses along with their voluminous financial exhibits. Second, the damage model at issue will demonstrate almost $400 million in sales. Introduction of that figure prior to a determination of liability may prejudice the jury against Defendants, inflame passion or otherwise impair a reasoned determination of liability. Third, and

because of scheduling conflicts, Plaintiffs' economist, Dr. Ackerman, is not available to testify until September 15, 2015. Given the Court's rulings on the motions in limine, and Plaintiffs' intent to try this case expeditiously, Plaintiffs believe if the case is bifurcated, the jury will have the case for deliberation on liability issues prior to that date. Accordingly, and if the Court does not bifurcate, trial will be unnecessarily delayed. While the Court stated in the Final Pretrial Conference Order the case will not be bifurcated without agreement from both sides, the Court was not made aware of scheduling issues that would support bifurcation and was still operating under the original estimate of 14 days, instead of the updated estimate of 9-10 days.

For those reasons, Plaintiffs again respectfully request that the Court permit them to try their liability claims first and before damage evidence or claims.[2]

**C. <u>Jury Selection</u>**

Pursuant to the Court's direction, both Plaintiffs and Defendants have submitted questions for the Court to ask the jury venire. On August 4, the Court indicated that the parties would each have just ten minutes to question the panel, and that any questioning would be limited to "follow up" of the Court's questioning. Plaintiffs respectfully request additional time for attorney-conducted voir dire. Many putative jurors will have strong pre-existing biases about class action cases, "alternative" health care products, and large civil damage awards. Given that the Court has allowed 14 days for the parties to present evidence, Plaintiffs respectfully submit that 30 minutes per side to question the panel is necessary and justified to select a fair and impartial jury. Given also that the trial

---

[2] Should the Court bifurcate the case, Plaintiffs respectfully request that the Court not communicate in any way to the jury that a finding in favor of Plaintiffs on liability will require a second phase of evidence and deliberation. Courts routinely avoid doing so to avoid the obvious prejudice to the Plaintiffs in bifurcated trials. Here, and given the 14 day limit the Court has imposed, Plaintiffs are confident that the jury can hear both phases in well under 14 days.

will now take less than 14 days (especially if bifurcated), additional time for attorney voire dire will not unduly delay trial proceedings.

### III. NATURE AND PRESENTATION OF CLAIMS

Plaintiffs will present evidence to support the following legal and equitable claims simultaneously to the Court and jury.

**A. Legal Claims (to be determined by the jury):**

> 1. <u>California's Consumer Legal Remedies Act (CLRA) (Civil Code Section 1770(a)</u>

Plaintiffs allege Defendants violated provisions of the CLRA. The purpose of the CLRA is to provide broad protection for consumers against unfair and deceptive business practices.

To establish this claim, Plaintiffs must prove by a preponderance of the evidence the following:

> 1. Defendants made representations about benefits of the product on the packaging that were likely to deceive;
> 2. Defendants' representations were material to a reasonable consumer; and
> 3. Defendants' representations were a substantial factor in causing Plaintiffs' harm.

Plaintiffs will present separate claims as to each of the products at issue.

> 2. <u>Breach of Express Warranty & Magnuson-Moss Act (15 U.S.C. Section 2301, Et. Seq)</u>

Plaintiffs claim they were harmed by Defendants' homeopathic products because Defendants represented that the products were effective to relieve symptoms, but the products were not as presented. To establish these claims, Plaintiffs must prove by a preponderance of the evidence the following:

> 1. That Plaintiffs purchased products manufactured by Defendants;

2. That Defendants through their product packaging made representations to plaintiffs regarding Defendants' products;

3. That Defendants' products did not perform as promised;

4. That Plaintiffs took reasonable steps to notify Defendants within a reasonable time that the products were not as represented;

5. That Plaintiffs were harmed; and

6. That the failure of the product to be as represented was a substantial factor in causing Plaintiffs' harm.

**B. Equitable Claims (to be determined by the Court):**

1. <u>Unfair Competition Law Claims</u>

Plaintiffs will present evidence to support their claims for violations of Business & Professions Code sections 17200 and 17500, for Unfair Business Competition Law and False Advertising Law.

Plaintiffs will demonstrate Defendants' violated the UCL by establishing by the preponderance of the evidence the following:

1. Defendant made representations that were actually false or provided information in a manner that it was likely to mislead or deceive the consumer because the products cannot relieve symptoms as represented;

2. Defendants engaged in business conduct that was unfair by either violating an applicable law or violating the public policy or spirit of unfair business competition law by engaging in false or misleading advertising; and

3. Plaintiffs suffered injury by purchasing products they would not have purchased but for the false or deceptive advertising.

2. <u>False Advertising Law Claims</u>

Plaintiffs will demonstrate Defendants violated the FAL by proving by a preponderance of the evidence the following:

1. Defendants disseminated to the public for the purpose of inducing sales,

advertising statements;

2. Defendants' advertising statements were untrue or misleading such that those statements were likely to deceive the reasonable consumer because the products cannot relieve symptoms as represented; and

3. Defendants knew, or by the existence of reasonable care should have known, the statements were likely to deceive the reasonable consumer.

The parties have agreed after the jury returns a verdict on liability and/or damages, the Court will then make findings of law and fact as to the equitable claims and a determination of equitable remedies, including restitution and/or disgorgement. While the Plaintiffs would not be able to recover the same damages awarded by the jury as part of the equitable restitution, the findings of both the jury and the Court would be included in one judgment.

In addition, and to the degree that the Court requires additional information from any witness, the Court may, at her discretion, inquire of any witness outside the presence of the jury relating to equitable claims. The parties otherwise welcome guidance and input from the Court in order to best aid the Court in adjudicating the equitable claims.

## IV. PLAINTIFFS WILL PROVE THAT, TAKEN AS A WHOLE, THE PACKAGING OF DEFENDANTS' PRODUCTS IS FALSE AND MISLEADING.

Consistent with the Court's prior rulings, Plaintiffs will prove that "statement[s] on [Defendant's] product packaging . . . , in combination with other statements *taken as a whole,* were misleading." Doc. 381, p. 17. Taken as a whole, statements on the packaging of Defendants' products are false and misleading because the products are not in fact effective to relieve any condition. Rather, Defendants are charging consumers substantial sums for products that have no more than a "placebo" effect.

### A. Expert Testimony Supports Plaintiffs' Claims

Plaintiffs' experts, Drs. Rose and Lee, will testify there is no scientific evidence to demonstrate Hyland's products are effective for relieving symptoms as represented. Moreover, for products not advertised as "effective," Dr. Rose will testify that the underlying principles of homeopathy are biologically implausible and accordingly the products cannot be effective treatments for their advertised symptoms, other than to provide an undisclosed placebo effect. Dr. Lee will testify there is no scientific proof to support Defendants' claim that their products contain nanoparticles. Dr. Lee will demonstrate nanoparticles are not mere byproducts of the homeopathic process, as suggested by Defendants, but can only exist by purposeful development, not by accident. In addition, both Drs. Rose and Lee will testify that a placebo-controlled human clinical trial conducted by the University of Washington at Hyland's request showed that Cough N' Cold 4 Kids – a product pharmacologically equivalent to the Defend Cold & Cough products in this case – demonstrated the product was no more effective than placebo (and for certain conditions, the placebo was more effective).

### B. Defendants' Labels are Misleading

Plaintiffs will prove Defendants violated the CLRA, through the totality of Defendants' representations on its products' packaging, as well as the failure to provide material information Defendants' knew, but withheld from consumers. Defendants' products claim to be "effective" for relieving specific symptoms, but Defendants have no empirical evidence to support their claims of effectiveness. Defendants' affirmative misstatements about the effectiveness of their products, coupled with the lack of information provided to consumers, has resulted in consumers' fundamental confusion about the products and reliance on materially false information.

/ / /

### C. Defendants' Labels Contain Material Omissions

Defendants know consumers do not understand the dilutions displayed on their labels and, importantly, did not understand how homeopathic products were manufactured, or even the ideology of homeopathy. Defendants chose to not provide material information to consumers, such as the FDA statement about the lack of scientific proof or evidence to support homeopathic principles or that the products were not reviewed by the FDA in the current form, or that "X" dosages means the product has been diluted and the fundamental principle of homeopathy is the consumer will only need to ingest a miniscule amount of ingredients. Although Defendants tout their beliefs in homeopathy, they never explain those beliefs to the consumers and, instead, through deceptive practices, mislead consumers about their products. Defendants never use the word "dilution" on any of the products and do not explain the highly-diluted levels of ingredients, even though they know consumers are not knowledgeable about the homeopathic process or its ideology.

Dr. Krosnick will testify about consumers' purchasing decisions and that consumers do, in fact, rely on Defendants' labeling claims of purported effectiveness. Dr. Krosnick will specifically testify if consumers had additional information about homeopathy and about the FDA's position about homeopathic products, their beliefs about the product change materially, and also that consumers are confused about the product. Dr. Krosnick's opinions are based on his research and analysis of a survey gathering information about consumers and his review of a clinical trial regarding Hyland's Teething Tablets conducted by Hyland's at the University of Washington, which illustrated the homeopathic products are no more effective than a placebo.

Each of the named plaintiffs will testify they purchased Defendants' products, relied on the representations on the product that it would be effective to

eliminate certain symptoms and the product was not effective.  Plaintiffs will also testify they were not aware of the dilution levels and believed the representation of "X" meant the product was had more of the ingredients, not less.

### D. The Federal Trade Commission Just Released Its Findings That Homeopathic Marketing Causes Consumer Confusion

On August 21, 2015, the Federal Trade Commission ("FTC") responded to the FDA's request for public comments about the potential for consumers to be confused by the current FDA lack of regulation of homeopathic industry.  The FTC unequivocally found consumers *are* confused by homeopathic products, assume the products are regulated by the FDA and that clinical trials would be required to make claims of efficacy.  The FTC official reports states:

> For the reasons discussed below, the FTC staff recommends that the FDA reconsider its regulatory framework for homeopathic medicines. The FTC staff is concerned that the FDA's existing regulatory framework may conflict with the Commission's advertising substantiation policy in ways that may harm consumers and create confusion for advertisers. **These concerns are bolstered by the results of FTC staff research exploring consumers' understanding and perceptions of homeopathy and homeopathic drugs**. As explained below, this evidence suggests that a significant percentage of consumers do not understand homeopathy, how the FDA regulates homeopathic drugs, **or the level of scientific evidence supporting homeopathic claims**.
>
> \*\*\*
>
> This research, combined with additional observations regarding how homeopathic remedies are marketed, exacerbates the concerns raised above, because our research suggests that a significant percentage of consumers do not understand the nature of homeopathic products, how they are regulated, or the level of substantiation to support claims for those products…. **The copy test results reveal that many consumers mistakenly believed that the FDA has approved homeopathic products for efficacy**.
>
> \*\*\*
>
> In addition to what we found in our copy test and focus group research, the FTC staff has observed other potential causes of consumer confusion in the marketing of homeopathic remedies… **Confusion is likely created, as well, by the terminology used in homeopathy product labeling**. In current labeling for homeopathic products, a manufacturer normally states that a product contains a particular substance in an amount that is

10

expressed as a number followed by an "X," such as "2X." For instance, 2X represents a dilution of 1 to 100 (1:100), or, in other words, a 1% concentration. **For the average consumer or even a sophisticated one, it is difficult to understand what 2X means.**

**The FTC staff is concerned that consumers may choose homeopathic products over proven medicine based on any or all of the misperceptions and incomplete or incorrect information described above.** As our research has indicated, once consumers were given access to basic information about homeopathy, they were more skeptical of the homeopathic treatment than **when they incorrectly believed that homeopathic was simply a synonym for "natural" and had no knowledge of the principles behind homeopathy**… **These results support the conclusion that consumers have incorrect perceptions about human efficacy testing for homeopathic products.**

The FTC official comments support exactly the claims made in this action, namely that consumers are confused by Hyland's products and are provided insufficient and misleading information on the product labels.  The FTC also confirmed manufacturers, like Hyland's, have not conducted any scientific testing sufficient to make any claim of effectiveness.  As such, Plaintiffs will use this evidence to support their claims.

## V.    CONCLUSION

Plaintiffs commit to try their claims clearly, efficiently and civilly. Plaintiffs welcome additional inquiry if necessary from the Court at any point during trial to aid its effective administration of justice.

Dated: August 25, 2015         **LAW OFFICES OF RONALD A. MARRON**

/s/ Skye Resendes
RONALD A. MARRON
*ron@consumeradvocates.com*
SKYE RESENDES
*skye@consumeradvocates.com*
651 Arroyo Drive
San Diego, California 92101
Telephone:  (213) 892-9200
Facsimile:  (213) 892-9494

Dated: August 25, 2015     **KREINDLER & KREINDLER, LLP**

/s/ Gretchen Nelson
GRETCHEN M. NELSON
*gnelson@kreindler.com*
GABRIEL S. BARENFELD
*gbarenfeld@kreindler.com*
707 Wilshire Boulevard, Suite 3600
Los Angeles, California 90017
Telephone: (213) 622-6469
Facsimile: (213) 622-6019

Dated: August 25, 2015     **GOMEZ TRIAL ATTORNEYS**

/s/ John H. Gomez
JOHN H. GOMEZ (171485)
jgomez@gomeztrialattorneys.com
DEBORAH S. DIXON (248965)
ddixon@gomeztrialattorneys.com
655 W. Broadway Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
Facsimile: (619) 237-3496

Class Trial Counsel