JEFFREY B. MARGULIES, BAR NO. 126002
jeff.margulies@nortonrosefulbright.com
STEPHANIE A. STROUP, BAR NO. 235071
stephanie.stroup@nortonrosefulbright.com
SPENCER PERSSON, BAR NO. 235054
spencer.persson@nortonrosefulbright.com
JADE JURDI, BAR NO. 273401
jade.jurdi@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
555 South Flower Street
Forty-First Floor
Los Angeles, California  90071
Telephone:  (213) 892-9200
Facsimile:   (213) 892-9494

Attorneys for Defendants
STANDARD HOMEOPATHIC COMPANY,
HYLAND'S, INC. and STANDARD
HOMEOPATHIC LABORATORIES, INC.

## IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| KIM ALLEN, et al. on behalf of themselves, all others similarly situated and the general public, | Case No.  12-cv-1150-DMG-MAN <u>CLASS ACTION</u> |
| Plaintiffs, | **[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW  PURSUANT TO LOCAL RULE 52-3** |
| v. | |
| HYLAND'S INC., et al., | Trial Date:  September 1, 2015 Submitted:  October 6, 2015 |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.     PLAINTIFFS' EQUITABLE CLAIMS ..................................................... 1

II.    FINDINGS OF FACT RELATING TO EQUITABLE CLAIM 1: UNFAIR COMPETITION LAW ("UCL") ............................................... 1

    A.   Element 1:  Did Defendants make representations that were actually false or provided information in a manner that it was likely to mislead or deceive the consumer because the products cannot relieve symptoms as represented? ..................................... 1

        1.   The Statements on the Product Labels ..................................... 1

        2.   Named Plaintiffs' Testimony ................................................... 2

        3.   Plaintiffs' Experts' Testimony ................................................. 4

        4.   Defendants' Experts' Testimony ............................................. 5

        5.   Consumer Satisfaction Testimony ........................................... 9

    B.   Element 2:  Did Defendants engage in business conduct that was unfair by either violating an applicable law or violating the public policy or spirit of unfair business competition law by engaging in false or misleading advertising? ..................................... 11

    C.   Element 3:  Did Plaintiffs suffer injury by purchasing products they would not have purchased but for the false or deceptive advertising? .......................................................................................... 13

III.   FINDINGS OF FACT RELATING TO EQUITABLE CLAIM 2: FALSE ADVERTISING LAW ("FAL") ................................................. 14

    A.   Element 1:  Did Defendants disseminate to the public for the purpose of inducing sales, advertising statements? ........................... 14

        1.   The Statements on the Product Labels ..................................... 14

        2.   FDA Requirement Testimony ................................................. 15

    B.   Element 2:  Were Defendants' advertising statements untrue or misleading such that those statements were likely to deceive the reasonable consumer because the products cannot relieve symptoms as represented? ............................................................. 17

        1.   Named Plaintiffs' Testimony ................................................... 17

        2.   Plaintiffs' Experts' Testimony ................................................. 19

        3.   Defendants' Experts' Testimony ............................................. 20

        4.   Consumer Satisfaction Testimony ........................................... 24

        5.   Purchasing Rationale Testimony ............................................. 25

DOCUMENT PREPARED ON RECYCLED PAPER

# TABLE OF CONTENTS
(continued)

**Page**

C.   Element 3:  Did Defendant know, or by the existence of reasonable care should they have known, the statements were likely to deceive a reasonable consumer?..............................................26

IV.   CONCLUSIONS OF LAW.........................................................................27

A.   The Jury's Verdict Binds This Court On Each Of The Equitable Claims ........................................................................................................27

B.   The Evidence Does Not Support A Finding That Defendants' Products Cannot Work ...................................................................................28

1.   The Named Plaintiffs' Testimony Did Not Prove That Defendants' Products Cannot Work ........................................29

2.   Plaintiffs' Experts' Testimony Did Not Show That Defendants' Products Cannot Work ........................................29

3.   Evidence From the Defense Was Credible And Showed That, At Worst, Scientists Are Split On the Effectiveness of Homeopathy .............................................................................32

C.   The Evidence Does Not Support A Finding That Defendants' Representations of Symptomatic Relief Were Unfair Or To Induce Sales .................................................................................................33

D.   The Evidence Does Not Support A Finding That The Representations of Symptomatic Relief Caused Injury Or Were Likely To Deceive...................................................................................34

E.   Plaintiffs' Claims Are Barred by the Safe Harbor Doctrine...............35

F.   Plaintiffs' Claims Are Preempted .......................................................35

V.   CONCLUSION .........................................................................................36

DOCUMENT PREPARED
ON RECYCLED PAPER

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

4

**Cases**

5

*Bronson v. Johnson & Johnson*,
6
   2013 WL 1629191 (N.D. Cal. Apr. 16, 2013) ....................................30

7

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*,
8
   20 Cal. 4th 163 (1999)...............................................................35

9

*Chavez v. Nestle USA, Inc.*,
   2011 WL 2150128 (C.D. Cal. May 19, 2011).......................................29
10

*Cipollone v. Liggett Group, Inc.*,
11
   505 U.S. 504 (1992) ..................................................................35

12

*Colgan v. Leatherman Tool Group, Inc.*,
13
   135 Cal. App. 4th 663 (2006)........................................................29

14

*Fraker v. Bayer Corp.*,
15
   2009 WL 5865687 (E.D. Cal. Oct. 6, 2009) .......................................29

16

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
17
   505 U.S. 88 (1992) ....................................................................35

18

*In re GNC Corp.; Triflex Products Marketing & Sales Practices Litig.*,
19
   Slip Opinion, Case No. 14-1724 (4th Cir. 2015) ...................30, 31, 32

20

*Kar-Ru Chemical Co. v. United States*,
   *264 F. 921, 927 (1920).* ........................................30, 31, 32
21

22

*Lincoln v. Board of Regents*,
   697 F. 2d 928 (11th Cir. 1983).......................................................28
23

*Lopez v. Nissan N. America, Inc.*,
24
   201 Cal. App. 4th 572 (2011).........................................................35

25

*Los Angeles Police Protective League v. Gates*,
26
   995 F.2d 1469 (9th Cir. 1993) .......................................................28

27

28

54169536.3

-iii-

DOCUMENT PREPARED
ON RECYCLED PAPER

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

**Cases**

*Miller v. Fairchild Indus.*,
  885 F.2d 498 (9th Cir. 1989), cert. denied, 494 U.S. 1056 (1990) .................... 28

*Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.*,
  107 Cal. App. 4th 1336 (2003) .......................................................... 29, 30, 31, 32

*Perdoni Bros., Inc. v. Concrete Sys., Inc.*,
  35 F. 3d 1 (1st Cir. 1994) ................................................................................ 28

*Pom Wonderful LLC v. Coca Cola Co.*,
  2013 U.S. Dist. LEXIS 33501 (C.D. Cal. Feb. 13, 2013) .................................. 35

*Seven Cases of Eckman's Alternative v. United States*,
  239 U.S. 510 (1916) ...................................................................................... 31

*Vigil v. Gen. Nutrition Corp.*,
  2015 WL 2338982 (S.D. Cal. May 13, 2015) ............................................. 30, 31

-iv-

DOCUMENT PREPARED ON RECYCLED PAPER

# I. PLAINTIFFS' EQUITABLE CLAIMS

Claim 1:     Defendants violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

Claim 2:     Defendants violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.

*See* Final Pre-Trial Conference Order Pursuant to Local Rule 16-7, Docket #382 at 4, 5.

# II. FINDINGS OF FACT RELATING TO EQUITABLE CLAIM 1: UNFAIR COMPETITION LAW ("UCL")

## A. Element 1: Did Defendants make representations that were actually false *or* provided information in a manner that it was likely to mislead or deceive the consumer because the products cannot relieve symptoms as represented?

### 1. The Statements on the Product Labels.

1.     The labeling for Calms Forté represents that the product is a "Sleep Aid" and "Relieves stress to help you sleep."

2.     The labeling for Teething Tablets represents that the product "Provides Symptomatic Relief for Teething Children."

3.     The labeling for Migraine Headache Relief represents that the product is "Safe & Effective" and "Relieves" "Pressure," "Throbbing," and "Light & Noise Sensitivity."

4.     The labeling for Colic Tablets represents that the product provides "Symptomatic Relief for Colic in Children."

5.     The labeling for Leg Cramps with Quinine represents that the product provides "Cramp Relief."

6.     The labeling for Leg Cramps represents that the product helps "Relax Calf & Foot Cramps."

7.      The labeling for Defend Cold & Cough represents that the product provides "Safe & Effective Relief" for "Nasal Congestion," "Cough," "Sore Throat," and "Sneezing."

8.      The labeling for Defend Cold & Cough Night represents that the product provides "Safe & Effective Relief" for "Sleeplessness," "Congestion," "Cough," "Sore Throat," and "Sneezing."

9.      The labeling for Hyland's Cough represents that the product provides "Safe & Effective Relief" for "Dry Cough," "Tickling Cough," and "Moist Cough."

10.     The labeling for Seasonal Allergy Relief represents that the product is "Safe & Effective," and provides relief for "Itchy, Watery, eyes," "Sneezing," "Runny nose," and "Itchy nose & throat."

## 2.    Named Plaintiffs' Testimony.

11.     Named Plaintiff Kim Allen testified that she purchased Calms Forté, Leg Cramps with Quinine, Colic Tablets, and Migraine Headache Relief.  Allen testified that none of these products worked.  However, Allen also testified that not all drugs work for all people, that other drugs had not worked for her over time, and that she does not expect every medication to work for her every time.  She further testified that prescription medication was needed to ease her daughter's sleeplessness, which suggests a larger problem beyond what is likely to be remedied purchasing an over-the-counter sleep aid, such as Calms Forté.  Allen also testified that her daughter ultimately did not have colic, so Colic Tablets could not have worked.  With respect to Migraine Headache Relief, she testified that other over the counter medications did not improve her condition either.

12.     Named Plaintiff Daniele Xenos testified that she purchased Calms Forté, Leg Cramps, Migraine Headache Relief, and Teething Tablets.  Xenos testified that she cannot say one way or the other whether Calms Forté worked. Teething Tablets worked for one of her children but not the other, and she still uses other homeopathic products with success.  While she did not believe that Migraine

1  Headache Relief provided her with relief, she testified that nothing else worked
2  either.  She also was dissatisfied with Leg Cramps, but she testified that she was
3  suffering from other confounding medical conditions such as scoliosis and extreme
4  nervousness, which could impact the effectiveness of any single medication.  She
5  did not recall viewing the packaging of any of the products in the store.

6      13.  Named Plaintiff Sherrell Smith testified that she purchased Leg
7  Cramps.  She testified that she had ongoing leg cramp issues, and had been
8  prescribed a muscle relaxant by a doctor that worked, indicating that her condition
9  warrants more significant medical intervention than an over-the-counter remedy can
10  provide.  She also testified that she has taken non-homeopathic sinus and allergy
11  medications that did not work for her.

12      14.  Named Plaintiff Nancy Rodriguez testified that she purchased
13  DEFEND Cold & Cough Night, Calms Forté, and Migraine Headache Relief.  She
14  testified that she purchased them along with numerous other homeopathic remedies
15  online, in bulk, and not based on any representations on the packaging.  Rodriguez
16  is a trained nurse, and while she claims that Defendants' products did not work, she
17  swears by the effectiveness of a half-dozen other homeopathic products.

18      15.  Named Plaintiff Yuanke Xu testified that he purchased Hyland's
19  Cough and Seasonal Allergy Relief.  The jury was left to conclude that both
20  products worked for Xu.  While he claimed that they did not work, he admitted that
21  he took both of the products, and his symptoms went away within a few hours,
22  eliminating the need to take a second dose as directed four hours later.

23      16.  Named Plaintiff Diana Sisti testified that she purchased Migraine
24  Headache Relief, Defend Cold & Cough, and Defend Cold & Cough Night.  With
25  respect to the DEFEND Cold & Cough products, Sisti testified that her symptoms
26  were flu-like, and therefore did not necessarily match those that the products are
27  intended to treat.  She further testified that she purchased Migraine Headache Relief
28  because she had a headache, and does not suffer from migraines.  She further

1   testified that she does not share Plaintiffs' counsels' theory that homeopathic
2   products cannot work, and has taken other medications over time which have not
3   worked for her but where she did not file a lawsuit.

4       17.   Named Plaintiff Melissa Nigh testified that she purchased Teething
5   Tablets and Calms Forte for her two children.  She purchased several bottles of
6   Teething Tablets for her two children even though she claims it did not work, and
7   even though her son's symptoms persisted for over two years, well beyond the time
8   Defendants recommend consultation with a doctor if the product does not work.
9   She did not purchase Teething Tablets based on any representations on the labeling.
10  She also purchased Calms Forte for her children, even though it is not intended for
11  use with children.  She further admitted that she believes different people react
12  differently to different medications.

13              **3.   Plaintiffs' Experts' Testimony.**

14      18.   Plaintiffs did not conduct any testing of Defendants' products to
15  determine effectiveness.  Instead, Plaintiffs argued that homeopathy is ineffective,
16  relying on controverted expert testimony from their experts, Drs. Rose and Lee.

17      19.   Neither Dr. Rose nor Dr. Lee assisted Plaintiffs in carrying their
18  burden of proof that Defendants' products cannot relieve symptoms, because both
19  of them admitted that each product and its ingredients must be tested in order to
20  reach a conclusion that it is not effective.  Both admitted that they had not tested
21  Defendants' products, and were not offering an opinion about those individual
22  products.

23      20.   Dr. Rose and Dr. Lee also relied upon the lack of clinical trials on
24  Defendants' products.  However, both admitted that the lack of evidence, or results
25  of the inconclusive studies, do not actually establish that the products are
26  ineffective.

27      21.   For example, throughout the trial, Plaintiffs argued that the Taylor
28  study on Hyland's 4 Kids Cold 'n Cough product showed that all of Defendants'

products were not effective.  Dr. Taylor, one of three researchers who worked on the project, testified that the primary outcome measure did not show that the product was statistically more effective than a placebo, but he also testified that the study had design flaws and the results were not statistically significant.

22.     On cross-examination, Dr. Rose testified that the Taylor study on Hyland's 4 Kids Cold 'n Cough could not show that the Defend Cold & Cough and Defend Cold & Cough Night products at issue in this matter were ineffective or that all homeopathic products were ineffective, because the study was insufficiently powered.  Dr. Rose also testified that the study, conducted in children, could not be applied to the products at issue in this case because a study conducted in children should not be applied to adults or products intended for adults.

23.     While Dr. Rose and Dr. Lee both opined that clinical trials did not support the conclusion that homeopathy in general was effective, they dismissed clinical trials, systematic reviews, meta-analyses, and *in vivo* and *in vitro* research that showed a positive effect for homeopathic drugs by concluding that they are flawed or that the investigators must be biased.

24.     Plaintiffs contended that the mechanism of action of homeopathic drugs is not known, but both Dr. Rose and Dr. Lee agreed that one does not need to know a mechanism of action in order to determine whether a drug is effective.

25.     Dr. Rose also admitted that whether homeopathic drugs can be effective is an ongoing scientific debate, and that reputable scientists believe homeopathy is effective.  He even when so far as to credit each of Defendants' experts as a reputable scientist.

### 4.     Defendants' Experts' Testimony.

26.     Defendants presented several expert witnesses discussing homeopathy, its history, its application, and supporting scientific theories.  Those experts discussed clinical trials, clinical experience, animal studies, and in vitro studies, all of which show that homeopathically prepared materials can have effects on living

organisms and systems, and that those effects are not attributable to the placebo effect.

27.     Dr. Peter A.G. Fisher, the former Clinical Director, and the current Director of Research at the Royal London Hospital for Integrated Medicine, with board-certification in rheumatology and accreditation in homeopathy, testified that homeopathy is a 200 year old school of medicine that is supported by contemporary scientific theory and testable models.  Dr. Fisher is a fully qualified doctor, and continues to treat and advise patients, including as the personal Physician to Her Majesty Queen Elizabeth II, as well as other members of the Royal Family.  Dr. Fisher testified that there are two main principles underlying homeopathy:  the principle of "similars" and the use of the minimum dose necessary to stimulate a beneficial response without causing toxic effect in a sick person.  The principle of similars espouses the theory that "like cures like."  This principle is in some ways analogous to the scientific underpinnings for flu shots that are widely disseminated each year.

28.     Dr. Fisher further explained that homeopathic remedies can be effective in treating symptoms, not by directly suppressing symptoms like conventional medicines, but by causing the body to adapt to and respond to a compound that causes those symptoms – much like the body reacts to a vaccine or an allergy shot.  Homeopathy strives for the minimum dose necessary to cause the body to adapt and respond.

29.     Dr. Fisher also explained that, in addition to the two hundred years of clinical experience of homeopathic physicians and practitioners, there are many clinical trials in which homeopathic treatments have shown a benefit, including numerous studies comparing a homeopathic treatment to placebo or conventional treatment.  Of approximately 300 published clinical trials, 45% were positive, 45% were inconclusive, and 10% were negative. Three of the four meta-analyses, and

1 many of the systematic reviews of homeopathy have found homeopathic treatment
2 is effective.

3      30.    Dr. Paolo Bellavite, a Professor of General Pathology in the
4 Department of Pathology and Diagnostics at Verona University in Italy, testified
5 that there is also a growing body of experimental evidence supporting the
6 conclusion that homeopathically prepared materials have an effect on animals and
7 on human cells.  For example, mice given homeopathically prepared Gelsemium
8 perform statistically differently than mice given a placebo in a standardized model
9 for the evaluation of anti-anxiety drugs, and this is an outcome that cannot be
10 attributed to the placebo effect.  Homeopathic dilutions of histamine cause human
11 basophils to reduce the allergic response, again an outcome that cannot be attributed
12 to the placebo effect since psychological effects cannot occur in an isolated cell in
13 the laboratory.  And, homeopathically prepared materials can retain different
14 electromagnetic properties, even when diluted to the point that no molecules of the
15 "active ingredient" are expected to be found.  These studies demonstrate that the
16 active ingredients used in homeopathy can have effects which differ from a
17 placebo, including in doses lower and higher that those used in Defendants'
18 products.  Dr. Bellavite further testified regarding support in the scientific literature
19 for the use of a number of the active ingredients in Defendants' homeopathic
20 products.

21      31.    Dr. Bernardo A. Merizalde, a medical doctor with a thriving medical
22 practice, established that experienced medical doctors regularly prescribe
23 homeopathic products, including those made by Defendants, and their patients
24 regularly experience considerable relief and clinical benefit from those drugs.
25 Based on this direct experience, Dr. Merizalde showed that some physicians believe
26 that homeopathic remedies like Defendants' products can provide a preferable
27 treatment regimen, in part because they have a greater safety profile than
28 conventional drugs.

32.   Dr. Iris Bell, a Professor at the University of Arizona in the Department of Family and Community Medicine and a Research Professor in the College of Nursing (and Defendants' Medical Director), testified about clinical trials she performed which established the efficacy of homeopathic remedies in patients with fibromyalgia, as well as showing that the EEG responses of patients were directly affected by sniffing homeopathically prepared medications.  Dr. Bell established that there is a growing understanding of the potential mechanism of action for homeopathic drugs.  Nanoparticle research is a relatively new area of science that has been proven to deliver minute quantities of medicine to cells in order to treat patients.  Nanoparticles are created in homeopathically-prepared medicines when they are triturated and succussed, and nanoparticles biosynthesized by plant extracts have demonstrated specific biological properties that can spur the body to respond.  Nanoparticles have been discovered in homeopathically prepared materials, even when they are so diluted that one would not expect to find any molecules of bulk materials.  According to Dr. Bell, this responds to one of the main criticisms of homeopathy, i.e., that "there is nothing there" and provides a plausible hypothesis for a mechanism of action for homeopathic drugs.

33.   Dr. Bell also testified that there was support in the traditional homeopathic literature —the Materia Medica—for the use of each ingredient in Defendants' products for the purposes for which they were indicated on the labeling.  The Materia Medica contains not only the results of "provings," the studies that show the toxic effects of the ingredients at high doses, but also the clinical experience of practitioners in treating patients with these active ingredients over the past 200 years.

34.   Dr. Bell further testified that two independent researchers besides Dr. Taylor who were involved in the 4 Kids Cough 'n Cold study later conducted further analysis on the study's secondary outcome measures, presented those

DOCUMENT PREPARED
ON RECYCLED PAPER

1  findings at a conference in Rome without Defendants' prior knowledge, and found
2  that the product was effective compared to a placebo.

3      35.    Additionally, Dr. Edward Calabrese, a Professor of Toxicology at the
4  University of Massachusetts at Amherst, testified regarding dose response.  The
5  effect of a drug or poison is generally directly related to the amount of the drug or
6  poison that a person takes – the more of the drug, the greater the effect.  At higher
7  doses, a drug or poison acts directly on the person's body to cause an effect.  At
8  much lower doses, a completely opposite effect can occur, and a toxin can actually
9  cause a beneficial response. This phenomenon is known as hormesis, a proven,
10  scientific phenomenon that may explain why homeopathic drugs are effective in
11  relieving symptoms.  In short, at the very low doses of active ingredients utilized in
12  homeopathy, the body may be stimulated to induce an adaptive response and
13  reverse the symptoms of illness.

14      36.    Defendants' expert Drs. Robbert van Haselen, a clinical
15  epidemiologist and Editor-in-Chief of the scientific journal "Complementary
16  Therapies in Medicine," testified that the Taylor study was inconclusive based on a
17  number of factors, including that it was insufficiently powered.  Drs. van Haselen
18  was the only expert to testify regarding the teething tablet study, concluding that it
19  was inconclusive due to a number of factors, including its design and execution.
20  Drs. van Haselen opined that, at a minimum, the placebo and product should have
21  tested as equally effective.  He also noted that one of the primary outcome measures
22  of the study was how long it would take for a tooth to break through the gums,
23  which has nothing to do with Defendants' product or any symptomatic relief for
24  teething pain.  In short, Drs. van Haselen found that neither study supported a
25  conclusion that Defendants' products were ineffective, or homeopathy cannot work.

### 5.    Consumer Satisfaction Testimony.

27      37.    Defendants' Chairman and CEO, Dr. John P. Borneman, testified that
28  Defendants have been in business for more than 100 years, and that many of the

1   products at issue have been on the market for quite some time.  He testified that the

2   ingredients in the products were well known, understood, and effective based on

3   200 years of experience and practice, and therefore appear in publications accepted

4   by the FDA such as the Homeopathic Pharmacopeia of the United States ("HPUS")

5   and Materia Medica.  He further testified that the consumer feedback Defendants

6   receive is generally very positive, and that his family uses Defendants' products.

7   Borneman was clear that Defendants' are proud of their homeopathic products, and

8   see homeopathy as a key distinguishing feature in the marketplace that they want to

9   highlight and want people to know about.  He testified that there is certainly no

10  evidence of mass consumer dissatisfaction with Defendants' products.

11      38.    Defendants' Vice President of Marketing, Thao Le, also testified about

12  the positive consumer feedback that Defendants receive, and that they make

13  concerted efforts to educate their consumers about homeopathy and proactively

14  attempt to educate and market to customers and prospective customers on social

15  media.  She, too, testified that the products work for her and her family.

16      39.    Dr. David Stewart, Editor of a Peer Reviewed Journal titled the Journal

17  of Public Policy and Marketing and a Professor of Marketing at Loyola Marymount

18  University, testified that a survey conducted by Defendants showed that 94% of

19  Defendants' actual customers were satisfied with Defendants' products and believe

20  that they work.

21      40.    Because of this evidence, and that presented by Defendants' experts,

22  Plaintiffs could not prevail on their UCL claim, because they did not prove that

23  Defendants' products cannot relieve symptoms and therefore the labeling was false

24  or deceptive.

25

26

27

28

**B.**     **Did Defendants engage in business conduct that was
unfair by _either_ violating an applicable law _or_ violating the public policy
or spirit of unfair business competition law by engaging in false or
misleading advertising?**

41.     Testimony from multiple witnesses, including Defendants' Chairman
and CEO, Dr. John P. Borneman, longtime FDA official and expert Edward
Miracco, and Defendants' Vice President of Marketing, Thao Le, established that
the Food and Drug Administration ("FDA") regulates the sale of all over-the-
counter ("OTC") drugs, including homeopathic drugs, that are manufactured,
marketed, and sold in this country.

42.     Dr. Borneman explained that the Homeopathic Pharmacopoeia
Convention publishes and updates the Homeopathic Pharmacopoeia of the United
States ("HPUS"), a publication that lists recognized homeopathic remedies and
ingredients.  The HPUS will not list any remedy or ingredient without evidence of
its safety and efficacy from traditional homeopathic literature or studies.

43.     Dr. Borneman and Mr. Miracco further testified that the United States
Food, Drug, and Cosmetic Act ("FDCA") recognizes as official the remedies and
standards in the HPUS.  This recognition was first adopted by Congress in 1938.
The FDCA was further amended in 1962.  The amendment required all "new"
drugs to be approved by the FDA as safe and effective.  Drugs that were on the
market at the time of the 1962 amendments were "grandfathered" from the new
drug approval process, subject to the FDA's later review at some undisclosed time
to ensure that they were safe and effective.  This included all OTC drugs on the
market at the time.

44.     Mr. Miracco also established that, in 1972, the FDA commenced the
OTC Drug Review process, intended to evaluate all OTC drugs that were on the
market, by category of products. The FDA reserved consideration of homeopathic

1   drugs until after the monographs for conventional OTC drugs were completed, and
2   has not to date commenced review of homeopathic drugs.

3       45.    Dr. Borneman, Ms. Le, and Defendants' Medical Director, Dr. Iris
4   Bell, established that all of the ingredients used in all of Defendants' products are
5   listed in the HPUS.  Dr. Borneman testified that Defendants were founded in 1903
6   as a company manufacturing homeopathic drugs for consumers who were looking
7   for a safe, natural alternative to traditional medications.  Defendants continue to
8   manufacture products for this same reason to this day, and Defendants' pharmacists
9   create the formulas for their products based on the remedies and ingredients
10  included in the HPUS.  As such, Defendants' products are recognized as drugs by
11  the FDCA.

12      46.    Mr. Miracco testified that the FDA does not require manufacturers like
13  Defendants to conduct randomized controlled trials to demonstrate that OTC drugs,
14  including homeopathic drugs, are effective.  The FDA also does not require or
15  expect that an OTC drug, including a homeopathic drug, be 100 percent effective.
16  Rather, the FDA requires that a significant proportion of the target population will
17  experience relief after using the products as directed and for the indicated use.

18      47.    Mr. Miracco and Ms. Le further testified that the FDA also regulates
19  the marketing and labeling of all over-the-counter drugs, including homeopathic
20  drugs.  The labeling for homeopathic drugs must comply with the following
21  guidelines:  (1) the homeopathic product must include at least one indication for use
22  on the label or packaging; and, (2) the homeopathic product must list the
23  ingredients of the product on the packaging.  <u>See</u> Tr. Ex. 296.  So long as
24  homeopathic drugs comply with these labeling requirements, among others, the
25  FDA permits the marketing and sale of homeopathic drugs like those at issue in this
26  matter.

27      48.    Le confirmed that all of Defendants' products comply with FDA
28  regulations relating to labeling.  Plaintiffs did not dispute this.

49.     All of this evidence shows that the FDA permits the marketing and sale of homeopathic drugs.  This evidence did not support Plaintiffs' contention that Defendants' products cannot relieve symptoms for any individuals who take them, and therefore Plaintiffs did not prove that the labeling was false or deceptive.

## C.     Element 3:  Did Plaintiffs suffer injury by purchasing products they would not have purchased but for the false or deceptive advertising?

50.     Several of the Plaintiffs testified that they did not view the product labeling prior to purchase or that they purchased the products for some other reason.  And, all Plaintiffs—and virtually all witnesses—agreed that a drug is not expected to work for all individuals who take it.

51.     Defendants presented both survey evidence and expert opinion through Dr. Stewart that the information contained on the labels and in advertising for Defendants' products is at best a very minor determinant of consumers' decisions to purchase Defendants' products.  Rather, the Actionable Research survey revealed that the primary reasons that Defendants' customers purchased Defendants' products were prior experience with homeopathy or other Hyland's products, or the recommendations of others, such as family, friends, or health care professionals. *See* Tr. Ex. 1189.  According to Dr. Stewart, the results of the Actionable Research survey are consistent with a large body of research on consumer purchasing behavior.

52.     Plaintiffs also did not prove harm because the evidence showed that Defendants have a system to respond to customer complaints.   Dissatisfied customers are given refunds upon request, a Hyland's policy for the entirety of its 110 years of operation.  None of the Plaintiffs attempted to contact Defendants for refunds, instead opting to file this suit.  As such, they cannot prove harm or damage.

## III.     FINDINGS OF FACT RELATING TO EQUITABLE CLAIM 2: FALSE ADVERTISING LAW ("FAL")

### A.     Element 1:   Did Defendants disseminate to the public for the purpose of inducing sales, advertising statements?

#### 1.     The Statements on the Product Labels.

53.     The labeling for Calms Forté represents that the product is a "Sleep Aid" and "Relieves stress to help you sleep."

54.     The labeling for Teething Tablets represents that the product "Provides Symptomatic Relief for Teething Children."

55.     The labeling for Migraine Headache Relief represents that the product is "Safe & Effective" and "Relieves" "Pressure," "Throbbing," and "Light & Noise Sensitivity."

56.     The labeling for Colic Tablets represents that the product provides "Symptomatic Relief for Colic in Children."

57.     The labeling for Leg Cramps with Quinine represents that the product provides "Cramp Relief."

58.     The labeling for Leg Cramps represents that the product helps "Relax Calf & Foot Cramps."

59.     The labeling for Defend Cold & Cough represents that the product provides "Safe & Effective Relief" for "Nasal Congestion," "Cough," "Sore Throat," and "Sneezing."

60.     The labeling for Defend Cold & Cough Night represents that the product provides "Safe & Effective Relief" for "Sleeplessness," "Congestion," "Cough," "Sore Throat," and "Sneezing."

61.     The labeling for Hyland's Cough represents that the product provides "Safe & Effective Relief" for "Dry Cough," "Tickling Cough," and "Moist Cough."

62.     The labeling for Seasonal Allergy Relief represents that the product is "Safe & Effective," and provides relief for "Itchy, Watery, eyes," "Sneezing," "Runny nose," and "Itchy nose & throat."

## 2.     FDA Requirement Testimony.

63.     Testimony from multiple witnesses, including Defendants' Chairman and CEO, John P. Borneman, longtime FDA official and expert Edward Miracco, and Defendants' Vice President of Marketing, Thao Le, established that the Food and Drug Administration ("FDA") regulates the sale of all over-the-counter ("OTC") drugs, including homeopathic drugs, that are manufactured, marketed, and sold in this country.

64.     Dr. Borneman explained that the Homeopathic Pharmacopoeia Convention is formed by a group of homeopathic practitioners, and it publishes and updates the Homeopathic Pharmacopoeia of the United States ("HPUS"), a publication that lists recognized homeopathic remedies and ingredients.  The HPUS will not list any remedy or ingredient without evidence of its safety and efficacy from traditional homeopathic literature or studies.

65.     Dr. Borneman and Mr. Miracco further testified that the United States Food, Drug, and Cosmetic Act ("FDCA") recognizes as official the remedies and standards in the HPUS.  This recognition was first adopted by Congress in 1938. The FDCA was further amended in 1962.  The amendment required all "new" drugs to be approved by the FDA as safe and effective.  Drugs that were on the market at the time of the 1962 amendments were "grandfathered" from the new drug approval process, subject to the FDA's later review at some undisclosed time to ensure that they were safe and effective.  This included all OTC drugs on the market at the time.

66.     Mr. Miracco also established that, in 1972, the FDA commenced the OTC Drug Review process, intended to evaluate all OTC drugs that were on the market, by category of products. The FDA reserved consideration of homeopathic

1  drugs until after the monographs for conventional OTC drugs were completed, and

2  has not to date commenced review of homeopathic drugs.

3      67.   Dr. Borneman, Ms. Le, and Defendants' Medical Director, Dr. Iris

4  Bell, established that all of the ingredients used in all of Defendants' products are

5  listed in the HPUS.  Dr. Borneman testified that Defendants were founded in 1903

6  as a company manufacturing homeopathic drugs for consumers who were looking

7  for a safe, natural alternative to traditional medications.  Defendants continue to

8  manufacture products for this same reason to this day, and Defendants' pharmacists

9  create the formulas for their products based on the remedies and ingredients

10 included in the HPUS.  As such, Defendants' products are recognized as drugs by

11 the FDCA.

12     68.   Mr. Miracco testified that the FDA does not require manufacturers like

13 Defendants to conduct randomized controlled trials to demonstrate that OTC drugs,

14 including homeopathic drugs, are effective.  The FDA also does not require or

15 expect that an OTC drug, including a homeopathic drug, be 100 percent effective.

16 Rather, the FDA only requires that a significant proportion of the target population

17 will experience relief after using the products as directed and for the indicated use.

18     69.   Mr. Miracco and Ms. Le further testified that the FDA also regulates

19 the marketing and labeling of all over-the-counter drugs, including homeopathic

20 drugs.   The labeling for homeopathic drugs must comply with the following

21 guidelines:  (1) the homeopathic product must include at least one indication for use

22 on the label or packaging; and, (2) the homeopathic product must list the

23 ingredients of the product on the packaging.  See Tr. Ex. 296.  So long as

24 homeopathic drugs comply with these labeling requirements, among others, the

25 FDA permits the marketing and sale of homeopathic drugs like those at issue in this

26 matter.

27     70.   Ms. Le confirmed that all of Defendants' products comply with FDA

28 regulations relating to labeling.

71.     This evidence shows that Defendants did not make the representations of symptomatic relief to induce sales; rather, Defendants are required by the FDA to include at least one indication for use on the product labeling and list the ingredients of the products on their packaging.

**B.      Element 2:  Were Defendants' advertising statements untrue or misleading such that those statements were likely to deceive the reasonable consumer because the products cannot relieve symptoms as represented?**

**1.     Named Plaintiffs' Testimony.**

72.     Named Plaintiff Kim Allen testified that she purchased Calms Forté, Leg Cramps with Quinine, Colic Tablets, and Migraine Headache Relief.  Allen testified that none of these products worked.  However, Allen also testified that not all drugs work for all people, that other drugs had not worked for her over time, and that she does not expect every medication to work for her every time.  She further testified that prescription medication was needed to ease her daughter's sleeplessness, which suggests a larger problem beyond what is likely to be remedied purchasing an over-the-counter sleep aid, such as Calms Forté.  Allen also testified that her daughter ultimately did not have colic, so Colic Tablets could not have worked.  With respect to Migraine Headache Relief, she testified that other over the counter medications did not improve her condition either.

73.     Named Plaintiff Daniele Xenos testified that she purchased Calms Forté, Leg Cramps, Migraine Headache Relief, and Teething Tablets.   Xenos testified that she cannot say one way or the other whether Calms Forté worked.  Teething Tablets worked for one of her children but not the other, and she still uses other homeopathic products with success.  While she did not believe that Migraine Headache Relief provided her with relief, she testified that nothing else worked either.  She also was dissatisfied with Leg Cramps, but she testified that she was suffering from other confounding medical conditions such as scoliosis and extreme

54169536.3

- 17 -

nervousness, which could impact the effectiveness of any single medication.  She did not recall viewing the packaging of any of the products in the store.

74.     Named Plaintiff Sherrell Smith testified that she purchased Leg Cramps.  She testified that she had ongoing leg cramp issues, and had been prescribed a muscle relaxant by a doctor that worked, indicating that her condition warrants more significant medical intervention than an over-the-counter remedy can provide.  She also testified that she has taken non-homeopathic sinus and allergy medications that did not work for her.

75.     Named Plaintiff Nancy Rodriguez testified that she purchased DEFEND Cold & Cough Night, Calms Forté, and Migraine Headache Relief.  She testified that she purchased them along with numerous other homeopathic remedies online, in bulk, and not based on any representations on the packaging.  Rodriguez is a trained nurse, and while she claims that Defendants' products did not work, she swears by the effectiveness of a half-dozen other homeopathic products.

76.     Named Plaintiff Yuanke Xu testified that he purchased Hyland's Cough and Seasonal Allergy Relief.  The jury was left to conclude that both products worked for Xu.  While he claimed that they did not work, he admitted that he took both of the products, and his symptoms went away within a few hours, eliminating the need to take a second dose as directed four hours later.

77.     Named Plaintiff Diana Sisti testified that she purchased Migraine Headache Relief, Defend Cold & Cough, and Defend Cold & Cough Night.  With respect to the DEFEND Cold & Cough products, Sisti testified that her symptoms were flu-like, and therefore did not necessarily match those that the products are intended to treat.  She further testified that she purchased Migraine Headache Relief because she had a headache, but does not suffer from migraines.  She further testified that she does not share Plaintiffs' counsels' theory that homeopathic products cannot work, and has taken other medications over time which have not worked for her but where she did not file a lawsuit.

78.     Named Plaintiff Melissa Nigh testified that she purchased Teething Tablets and Calms Forte for her two children.  She purchased several bottles of Teething Tablets for her two children even though she claims it did not work, and even though her son's symptoms persisted for over two years, well beyond the time Defendants recommend consultation with a doctor if the product does not work. She did not purchase Teething Tablets based on any representations on the labeling. She also purchased Calms Forte for her children, even though it is not intended for use with children.  She further admitted that she believes different people react differently to different medications.

## 2.     Plaintiffs' Experts' Testimony.

79.     Plaintiffs did not conduct any testing of Defendants' products to determine effectiveness.  Instead, Plaintiffs argued that homeopathy is ineffective, relying on controverted expert testimony from their experts, Drs. Rose and Lee.

80.     Neither Dr. Rose nor Dr. Lee assisted Plaintiffs in carrying their burden of proof that Defendants' products cannot relieve symptoms, because both of them admitted that each product and its ingredients must be tested in order to reach a conclusion that it is not effective.  Both admitted that they had not tested Defendants' products, and were not offering an opinion about those individual products.

81.     Dr. Rose and Dr. Lee also relied upon the lack of clinical trials on Defendants' products.  However, both admitted that the lack of evidence, or results of the inconclusive studies, do not actually establish that the products are ineffective.

82.     For example, throughout the trial, Plaintiffs argued that the Taylor study on Hyland's 4 Kids Cold 'n Cough product showed that all of Defendants' products were not effective.  Dr. Taylor, one of three researchers who worked on the project, testified that the primary outcome measure did not show that the

1   product was statistically more effective than a placebo, but he also testified that the
2   study had design flaws and the results were not statistically significant.

3       83.    On cross-examination, Dr. Rose testified that the Taylor study on
4   Hyland's 4 Kids Cold 'n Cough could not show that the Defend Cold & Cough and
5   Defend Cold & Cough Night products at issue in this matter were ineffective or that
6   all homeopathic products were ineffective, because the study was insufficiently
7   powered.  Dr. Rose also testified that the study, conducted in children, could not be
8   applied to the products at issue in this case because a study conducted in children
9   should not be applied to adults or products intended for adults.

10      84.    While Dr. Rose and Dr. Lee both opined that clinical trials did not
11  support the conclusion that homeopathy in general was effective, they dismissed
12  clinical trials, systematic reviews, meta-analyses, and in vivo and in vitro research
13  that showed a positive effect for homeopathic drugs by concluding that they are
14  flawed or that the investigators must be biased.

15      85.    Plaintiffs contended that the mechanism of action of homeopathic
16  drugs is not known, but both Dr. Rose and Dr. Lee agreed that one does not need to
17  know a mechanism of action in order to determine whether a drug is effective.

18      86.    Dr. Rose also admitted that whether homeopathic drugs can be
19  effective is an ongoing scientific debate, and that reputable scientists believe
20  homeopathy is effective.  He even when so far as to credit each of Defendants'
21  experts as a reputable scientist.

22              **3.    Defendants' Experts' Testimony.**

23      87.    Defendants presented several expert witnesses discussing homeopathy,
24  its history, its application, and supporting scientific theories.   These experts
25  discussed clinical trials, clinical experience, animal studies, and in vitro studies, all
26  of which show that homeopathically-prepared materials can have effects on living
27  organisms and systems, and that those effects are not attributable to the placebo
28  effect.

88.     Dr. Peter A.G. Fisher, the former Clinical Director, and the current Director of Research at the Royal London Hospital for Integrated Medicine, with board-certification in rheumatology and accreditation in homeopathy, testified that homeopathy is a 200 year old school of medicine that is supported by contemporary scientific theory and testable models.  Dr. Fisher is a fully qualified doctor, and continues to treat and advise patients, including as the personal Physician to Her Majesty Queen Elizabeth II, as well as other members of the Royal Family.  Dr. Fisher testified that there are two main principles underlying homeopathy:  the principle of "similars" and the use of the minimum dose necessary to stimulate a beneficial response without causing toxic effect in a sick person.  The principle of similars espouses the theory that "like cures like."  This principle is in some ways analogous to the scientific underpinnings for flu shots that are widely disseminated each year.

89.     Dr. Fisher further explained that homeopathic remedies can be effective in treating symptoms, not by directly suppressing symptoms like conventional medicines, but by causing the body to adapt to and respond to a compound that causes those symptoms – much like the body reacts to a vaccine or an allergy shot.  Homeopathy strives for the minimum dose necessary to cause the body to adapt and respond.

90.     Dr. Fisher also explained that, in addition to the two hundred years of clinical experience of homeopathic physicians and practitioners, there are many clinical trials in which homeopathic treatments have shown a benefit, including numerous studies comparing a homeopathic treatment to placebo or conventional treatment.  Of approximately 300 published clinical trials, 45% were positive, 45% were inconclusive, and 10% were negative.  Three of the four meta-analyses, and many of the systematic reviews of homeopathy have found homeopathic treatment is effective.

91.     Dr. Paolo Bellavite, a Professor of General Pathology in the Department of Pathology and Diagnostics at Verona University in Italy, testified that there is also a growing body of experimental evidence supporting the conclusion that homeopathically prepared materials have an effect on animals and on human cells.  For example, mice given homeopathically prepared Gelsemium perform statistically differently than mice given a placebo in a standardized model for the evaluation of anti-anxiety drugs, and this is an outcome that cannot be attributed to the placebo effect.  Homeopathic dilutions of histamine cause human basophils to reduce the allergic response, again an outcome that cannot be attributed to the placebo effect since psychological effects cannot occur in an isolated cell in the laboratory.  And, homeopathically prepared materials can retain different electromagnetic properties, even when diluted to the point that no molecules of the "active ingredient" are expected to be found.  These studies demonstrate that the active ingredients used in homeopathy can have effects which differ from a placebo, including in doses lower and higher that those used in Defendants' products.  Dr. Bellavite further testified regarding support in the scientific literature for the use of a number of the active ingredients in Defendants' homeopathic products.

92.     Dr. Bernardo A. Merizalde, a medical doctor with a thriving medical practice, established that experienced medical doctors regularly prescribe homeopathic products, including those made by Defendants, and their patients regularly experience considerable relief and clinical benefit from those drugs. Based on this direct experience, Dr. Merizalde showed that physicians believe that homeopathic remedies like Defendants' products can provide a preferable treatment regimen, in part because they have a greater safety profile than conventional drugs.

93.     Dr. Iris Bell, a Professor at the University of Arizona in the Department of Family and Community Medicine and a Research Professor in the College of Nursing (and Defendants' Medical Director), testified about clinical

trials she performed which established the efficacy of homeopathic remedies in patients with fibromyalgia, as well as showing that the EEG responses of patients were directly affected by sniffing homeopathically prepared medications. Dr. Bell established that there is a growing understanding of the potential mechanism of action for homeopathic drugs.  Nanoparticle research is a relatively new area of science that has been proven to deliver minute quantities of medicine to cells in order to treat patients.  Nanoparticles are created in homeopathically-prepared medicines when they are triturated and succussed, and nanoparticles biosynthesized by plant extracts have demonstrated specific biological properties that can spur the body to respond.  Nanoparticles have been discovered in homeopathically prepared materials, even when they are so diluted that one would not expect to find any molecules of bulk materials. According to Dr. Bell, this responds to one of the main criticisms of homeopathy, i.e., that "there is nothing there" and provides a plausible hypothesis for a mechanism of action for homeopathic drugs.

94.    Dr. Bell also testified that there was support in the traditional homeopathic literature —the Materia Medica—for the use of each ingredient in Defendants' products for the purposes for which they were indicated on the labeling. The Materia Medica contain not only the results of "provings," the studies that show the toxic effects of the ingredients at high doses, but also the clinical experience of practitioners in treating patients with these active ingredients over the past 200 years.

95.    Dr. Bell further testified that two independent researchers besides Dr. Taylor who were involved in the 4 Kids Cough 'n Cold study later conducted further analysis on the study's secondary outcome measures, presented those findings at a conference in Rome without Defendants' prior knowledge, and found that the product was effective compared to a placebo.

96.    Additionally, Dr. Edward Calabrese, a Professor of Toxicology at the University of Massachusetts at Amherst, testified regarding dose response.  The

1   effect of a drug or poison is generally directly related to the amount of the drug or

2   poison that a person takes – the more of the drug, the greater the effect.  At higher

3   doses, a drug or poison acts directly on the person's body to cause an effect.  At

4   much lower doses, a completely opposite effect can occur, and a toxin can actually

5   cause a beneficial response. This phenomenon is known as hormesis, a proven,

6   scientific phenomenon that may explain why homeopathic drugs are effective in

7   relieving symptoms.  In short, at the very low doses of active ingredients utilized in

8   homeopathy, the body may be stimulated to induce an adaptive response and

9   reverse the symptoms of illness.

10       97.   Defendants' expert Drs. Robbert van Haselen, a clinical

11  epidemiologist and Editor-in-Chief of the scientific journal "Complementary

12  Therapies in Medicine," testified that the Taylor study was inconclusive based on a

13  number of factors, including that it was insufficiently powered.  Drs. van Haselen

14  was the only expert to testify regarding the teething tablet study, concluding that it

15  was inconclusive due to a number of factors, including its design and execution.

16  Drs. van Haselen opined that, at a minimum, the placebo and product should have

17  tested as equally effective.  He also noted that one of the primary outcome measures

18  of the study was how long it would take for a tooth to break through the gums,

19  which has nothing to do with Defendants' product or any symptomatic relief for

20  teething pain.   In short, Drs. van Haselen found that neither study supported a

21  conclusion that Defendants' products were ineffective, or homeopathy cannot work.

## 4.   Consumer Satisfaction Testimony.

23       98.   Defendants' Chairman and CEO, Dr. John P. Borneman, testified that

24  Defendants have been in business for more than 100 years, and that many of the

25  products at issue have been on the market for quite some time.  He testified that the

26  ingredients in the products were well known, understood, and effective based on

27  200 years of experience and practice, and therefore appear in publications accepted

28  by the FDA such as the Homeopathic Pharmacopeia of the United States ("HPUS")

and Materia Medica.  He further testified that the consumer feedback Defendants receive is generally very positive, and that his family uses Defendants' products. Borneman was clear that Defendants' are proud of their homeopathic products, and see homeopathy as a key distinguishing feature in the marketplace that they want to highlight and want people to know about.  He testified that there was certainly no evidence of mass consumer dissatisfaction with Defendants' products.

99.    Defendants' Vice President of Marketing, Thao Le, also testified about the positive consumer feedback that Defendants receive, and that they make concerted efforts to educate their consumers about homeopathy and proactively attempt to educate and market to customers and prospective customers on social media.  She, too, testified that the products work for her and her family.

100.    Dr. David Stewart, Editor of a Peer Reviewed Journal titled the Journal of Public Policy and Marketing and a Professor of Marketing at Loyola Marymount University, testified that a survey conducted by Defendants showed that 94% of Defendants' actual customers were satisfied with Defendants' products and believe that they work.

101.    Because of this evidence, Plaintiffs could not prevail on their FAL claim, because they did not prove that Defendants' products cannot relieve symptoms and therefore the labeling was false or deceptive.

### 5.    Purchasing Rationale Testimony.

102.    Several of the Plaintiffs have testified that they did not view the product labeling prior to purchase or that they purchased the products for some other reason.  And, all Plaintiffs—and virtually all witnesses—agreed that a drug is not expected to work for all individuals who take it.

103.    Defendants presented both survey evidence and expert opinion through Dr. Stewart that the information contained on the labels and in advertising for Defendants' products is at best a very minor determinant of consumers' decisions to purchase Defendants' products.  Rather, the Actionable Research survey revealed

1   that the primary reasons that Defendants' customers purchased Defendants'
2   products were prior experience with homeopathy or other Hyland's products, or the
3   recommendations of others, such as family, friends, or health care professionals.
4   *See* Tr. Ex. 1189.  According to Dr. Stewart, the results of the Actionable Research
5   survey are consistent with a large body of research on consumer purchasing
6   behavior.

7       104.  Based on the above, a reasonable consumer was not likely to be
8   deceived by the labeling of Defendants' products.

9       **C.**    **Element 3:  Did Defendant know, or by the existence of reasonable**
10  **care should they have known, the statements were likely to deceive a**
11  **reasonable consumer?**

12      105.  Dr. Borneman testified that Defendants have been in business for over
13  100 years, and strive to bring products to market that its customers want, as
14  alternatives to conventional medication.  Dr. Borneman and Ms. Le testified that
15  Defendants have ongoing dialogue with their customers through various channels,
16  including social media, regarding customer desires. Much of Defendants' growth in
17  sales has been due to demand from retailers, who are also responding to consumer
18  demand for homeopathic medications.

19      106.  Numerous witnesses discussed the fact that homeopathy is a school of
20  medicine that was first described approximately 200 years ago. Witnesses discussed
21  that the Materia Medica contained the results of experiments and clinical
22  observations of physicians and homeopaths over that 200-year period. There are
23  numerous studies and experiments on homeopathic medicines published in
24  reputable scientific journals, including the journal *Homeopathy*, for which Dr.
25  Fisher is the Editor-in-Chief.

26      107.  Plaintiffs' own expert, Dr. Rose, conceded that that there was an
27  ongoing scientific debate about the effectiveness of homeopathy, and that there are
28  reputable scientists who believe that homeopathy is effective.

108.   Both of Plaintiffs' experts, Drs. Rose and Lee, conceded there are scientific studies which support the position that homeopathy is effective, including randomized control studies.

109.   Defendants' officers and employees, including Dr. Borneman and Ms. Le, testified that they believe the products do relieve symptoms, and use them themselves.

110.   As discussed above, Defendants presented several expert witnesses discussing homeopathy, its history, its application, and supporting scientific theories.  These experts discussed clinical trials, clinical experience, animal studies, and in vitro studies, all of which show that homeopathically-prepared materials can have effects on living organisms and systems, and that those effects are not attributable to the placebo effect.

111.   Because of this evidence supporting the effectiveness of homeopathy, and the existence of a scientific debate where reasonable experts believe that homeopathy is effective, Defendants reasonably believe that their homeopathic products are effective to relieve symptoms.  Because of Defendants' reasonable belief that their homeopathic products do relieve symptoms, they did not know, nor would they have known through the existence of reasonable care, that their statements were likely to deceive a reasonable consumer.

IV.   **CONCLUSIONS OF LAW**

A.   **The Jury's Verdict Binds This Court On Each Of The Equitable Claims**

1.   Plaintiffs asserted causes of action in this matter for breach of express warranty and violations of the Magnuson-Moss Warranty Act, the Consumer Legal Remedies Act, the Unfair Competition Laws, and the False Advertising Laws.

2.   The jury instructions for the warranty claims and the CLRA, and the elements of the UCL and FAL claims as set forth in this Court's Final Pre-Trial Order, all reflect the common thread that, in order to find in favor of Plaintiffs,

Plaintiffs had to prove that Defendants' products "cannot relieve symptoms as represented." This was the only common and uncontested element common to each of Plaintiffs' claims, and the question that was the focal point of both parties in closing argument.

3.     As such, in returning a verdict for Defendants on the warranty and CLRA claims, the jury necessarily made the factual determination that Plaintiffs did not prove that Defendants' products "cannot relieve symptoms as represented."

4.     Plaintiffs cannot recover in equity under the CLRA based on the Seventh Amendment and controlling authority because the jury expressly decided that Plaintiffs are not entitled to relief under the CLRA.

5.     The jury verdict also precludes recovery in equity under the UCL and FAL. "[W]here legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.'" *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (quoting *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989), cert. denied, 494 U.S. 1056 (1990)); *see also Lincoln v. Board of Regents*, 697 F. 2d 928, 934 (11th Cir. 1983) ("When a party has a right to a jury trial on an issue involved in a legal claim, the judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim."); *Perdoni Bros., Inc. v. Concrete Sys., Inc.*, 35 F. 3d 1, 5 (1st Cir. 1994) (same).

6.     Accordingly, this Court finds in favor of Defendants and against Plaintiffs on the equitable UCL and FAL claims for this reason alone.

## B.     The Evidence Does Not Support A Finding That Defendants' Products Cannot Work

7.     As stated above, each of Plaintiffs' certified, equitable claims require Plaintiffs to prove that Defendants' products cannot work. Plaintiffs were required

to submit affirmative evidence and actually prove that Defendants' representations were false under their equitable UCL and FAL claims, and could not meet their burden simply by claiming that the representations of symptomatic relief were unsubstantiated.  *Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.*, 107 Cal. App. 4th 1336, 1344-46 (2003) ("*King Bio*"); *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 682 (2006); *Chavez v. Nestle USA, Inc.*, 2011 WL 2150128, at *3 (C.D. Cal. May 19, 2011); *Fraker v. Bayer Corp.*, 2009 WL 5865687, at *8 (E.D. Cal. Oct. 6, 2009).  For the reasons set forth below, Plaintiffs did not carry this burden, did not prove that Defendants' products cannot work, and therefore cannot prevail on their equitable claims under the UCL (element 1) and FAL (element 2).

### 1.   The Named Plaintiffs' Testimony Did Not Prove That Defendants' Products Cannot Work

8.    This Court cannot conclude based on the testimony of the named Plaintiffs that Defendants' products cannot work.  Plaintiffs testified that different drugs work differently for different people, or that they do not expect all over-the-counter drugs to work for all people or for all drugs to work 100% of the time for them.  Some of the Plaintiffs also testified that they were suffering from symptoms that differed from those Defendants' products were intended to treat.  Two named Plaintiffs directly refuted the theory that homeopathy cannot work, testifying about the effectiveness of several homeopathic drugs other than the ones at issue.  Another Plaintiff testified that he took Defendants' products, and his symptoms were gone a few hours later.  This testimony does not prove that Defendants' products cannot work.

### 2.   Plaintiffs' Experts' Testimony Did Not Show That Defendants' Products Cannot Work

9.    This Court similarly cannot conclude based on the testimony of Plaintiffs' experts that Defendants' products cannot work.  Dr. Rose admitted that

homeopathy is the subject of a legitimate scientific debate, and that reputable scientists stood on both sides of the debate. He further testified that defense experts Dr. Fisher, Dr. Bell, Dr. Calabrese, Dr. Bellavite, and Drs. van Haselen were reputable scientists.

10.   Dr. Rose's admission that homeopathy is the subject of a legitimate scientific debate necessarily means that Plaintiffs cannot prove their theory that Defendants' products cannot work based on their homeopathic preparation. This testimony shows that, at most, Plaintiffs could only hope to prove that Defendants' representations of symptomatic relief were not substantiated. Lack of substantiation is not the same as proving the products cannot work, and is insufficient to prove false advertising claims under the UCL and FAL according to the binding precedent of *King Bio*. *See also Vigil v. Gen. Nutrition Corp*., 2015 WL 2338982, at *7 (S.D. Cal. May 13, 2015) (Plaintiffs' "reliance on a lack of scientific evidence or inconclusive, rather than contradictory, evidence is not sufficient.") (*citing Bronson v. Johnson & Johnson*, 2013 WL 1629191, at *8 (N.D. Cal. Apr. 16, 2013)).

11.   Dr. Rose's admission that homeopathy is the subject of a legitimate scientific debate also runs counter to the Fourth Circuit's opinion in *In re GNC Corp.; Triflex Products Marketing & Sales Practices Litig.*, Slip Opinion, Case No. 14-1724, *3, 9, 19-21 (4th Cir. June 19, 2015). There, the plaintiffs' allegations were similar to those certified here: GNC was purportedly making false representations that products that supposedly could not be effective were, in fact, effective. The Fourth Circuit held that "in order to state a false advertising claim on a theory that representations have been proven to be false, plaintiffs must allege that all reasonable experts in the field agree that the representations are false." *In re GNC Corp.*, *23.

12.   While *In re GNC Corp.* is not binding on this Court, it is consistent *Kar-Ru Chemical Co. v. United States*, where the Ninth Circuit approved the trial

court's instruction to the jury not to pass judgment on homeopathy generally, cautioning that "it is not proper in such a case as this to try rival well-established schools of medicine…." 264 F. 921, 927 (1920).  The Ninth Circuit cited as support a Supreme Court decision instructing that the words "false" and "fraudulent" must "exclude[] the field where there might be differences of opinion between schools and practitioners…." *Id.* at 928 (citing *Seven Cases of Eckman's Alternative v. United States,* 239 U.S. 510, 517-18 (1916)).  *In re GNC Corp.* is also consistent with California law insofar as it shows that, where a legitimate scientific debate exists, there can be no false advertising claim because the most a plaintiff can hope to prove is that the representations of symptomatic relief are unsubstantiated. *King Bio*, 107 Cal. App. 4th at 1344-46; *Vigil*, 2015 WL 2338982 at *7.

13.   Dr. Rose and Dr. Lee also admitted that they had not tested or inspected Defendants' products, and were therefore not offering opinions on the effectiveness of the individual products at issue in this case.  Both also admitted that, absent evidence about each individual product, they could not establish that the products cannot work.  Again, this falls short of the affirmative proof required under *King Bio*.  This also again falls short of the standard discussed by the Fourth Circuit in *In re GNC Corp.*, where, as here, the plaintiffs failed to make allegations relating to each product.  *In re GNC Corp.*, *23.  The court in *In re GNC Corp.* stated that,  "[t]o the extent that Plaintiffs failed to allege that all of the purportedly active ingredients in each product are ineffective at promoting joint comfort, health, and flexibility, they have failed to adequately plead falsity of the representations regarding the products as a whole."  Similarly, here Plaintiffs' experts' failure to attempt to prove that all of the active ingredients in each product are ineffective means that Plaintiffs could not sustain their burden of proving that Defendants' products cannot work.

### 3.   Evidence From the Defense Was Credible And Showed That, At Worst, Scientists Are Split On the Effectiveness of Homeopathy

14.   Defendants' experts presented credible evidence that precluded Plaintiffs from proving that Defendants' products cannot work.  As stated above, the Fourth Circuit held that "in order to state a false advertising claim on a theory that representations have been proven to be false, plaintiffs must allege that all reasonable experts in the field agree that the representations are false." *In re GNC Corp.*, *23.  In *Kar-Ru Chemical Co. v. United States*, the Ninth Circuit agreed, approving the trial court's instruction to the jury not to pass judgment on homeopathy, cautioning that "it is not proper in such a case as this to try rival well-established schools of medicine…." 264 F. 921, 927 (1920).  Through Dr. Fisher, Dr. Bellavite, Dr. Bell, Dr. Calabrese, and Drs. van Haselen, Defendants showed that reasonable experts believe that homeopathy can and does work.   These witnesses testified that many clinical trials and laboratory studies show that homeopathic products can work and that homeopathic medicines include measurable and quantifiable amounts of active ingredients.  They also presented evidence that homeopathically prepared materials have an effect on animals and human cells.  These tests show that homeopathic drugs have an effect that cannot just be attributed to the placebo effect, and that the effects of homeopathic ingredients differ from a placebo.  This evidence shows that there is scientific substantiation for homeopathy, and precludes Plaintiffs from proving that Defendants' products cannot work as required under *King Bio*.  107 Cal. App. 4th at 1344-46.

15.   Dr. Bell and Dr. Calabrese also rebutted Plaintiffs' theory that homeopathy cannot work by presenting evidence relating to nanotechnology and hormesis, which are emerging fields of scientific study that may explain the mechanism of action for homeopathic drugs.

16.    Dr. Merizalde further rebutted Plaintiffs' theory that homeopathy cannot work by presenting evidence of his use of homeopathy as a practicing physician, and his experience that his patients regularly experience relief and benefits from homeopathic remedies, including Defendants' products. Dr. Merizalde's experience was consistent with other anecdotal evidence presented at trial, including Rodriguez and Xenos' satisfaction with other homeopathic drugs, Le's use of Defendants' drugs for her family, and the survey evidence presented by Dr. Stewart that 94% of Defendants' customers are satisfied with Defendants' products.

17.    This evidence precludes this Court from finding that Defendants' products cannot work or relieve symptoms as represented under the UCL (element 1) and FAL (element 2).

**C.    The Evidence Does Not Support A Finding That Defendants' Representations of Symptomatic Relief Were Unfair Or To Induce Sales**

18.    The second element of Plaintiffs' UCL claim requires Plaintiffs to prove that Defendants' representations of symptomatic relief were unfair because they violate applicable law or public policy, or otherwise violate the spirit of the UCL.  The first element of Plaintiffs' FAL claim requires Plaintiffs to prove that Defendants disseminated the representations of symptomatic relief for the purpose of inducing sales.

19.    Plaintiffs did not meet their burden of proving that Defendants' representations of symptomatic relief were included for an unfair purpose or to induce sales.  The representations of symptomatic relief at issue in this case were required by the FDA, which mandates that homeopathic products include at least one indication for use on the label or packaging.  As such, Accordingly, Plaintiffs have not proved element 2 of their UCL claim or element 1 of their FAL claim.

**D.    The   Evidence   Does   Not   Support   A   Finding   That   The Representations of Symptomatic Relief Caused Injury Or Were Likely To Deceive.**

20.    The third element under Plaintiffs' UCL claim is whether Plaintiffs suffered injury that they would not have suffered but for the representations of symptomatic relief.   The third element under Plaintiffs' FAL claim is whether Defendants should have known that the statements were likely to deceive a reasonable consumer.

21.    Plaintiffs did not carry their burden of proving that they would not have suffered injury but for the representations of symptomatic relief.  Some of the Plaintiffs testified that they did not view the product labeling prior to purchase. The Plaintiffs also testified that they do not expect drugs to be effective 100 percent of the time, that different drugs work differently for different people, and that other over-the-counter drugs have not worked for them in the past.  None of the Plaintiffs sought or requested a refund, despite Defendants' long-standing policy of offering refunds to any dissatisfied customers.   Dr. Stewart testified that the primary determinants of consumer purchases are prior experience with the products and/or the recommendations of others, such as family, friends, or health care professionals. Product labeling is but a minor determinant.   This evidence all shows that Defendants' representations were not the but for cause of Plaintiffs' alleged injuries.

22.    Plaintiffs also did not carry their burden of showing that Defendants should have known that their representations were likely to deceive a reasonable consumer. Defendants' officers and employees all testified that they use homeopathic remedies, including Defendants' products, and believe that they work. Defendants have been selling homeopathic remedies for more than 100 years, and Defendants' CEO comes from a family tradition of manufacturing homeopathic drugs.  Homeopathy is currently the subject of a scientific debate, with reputable

scientists on both sides of the debate, many of whom testified at trial. Emerging research suggests that active ingredients are present in homeopathic preparations, and create effects different than a placebo. All of this evidence shows that Defendants should not have known that their representations of symptomatic relief were false, or that any consumers would be deceived.

23.    For these reasons, Plaintiffs have not carried their burden of proving element three of their UCL and FAL claims.

### E.    Plaintiffs' Claims Are Barred by the Safe Harbor Doctrine

24.    Plaintiffs' California consumer protection statute claims are barred by the safe harbor doctrine, which provides for a "safe harbor" for alleged misconduct that is permitted by the government. *See Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999); *see also Lopez v. Nissan N. America, Inc.*, 201 Cal. App. 4th 572, 594 (2011) (applied to the CLRA); *see also Pom Wonderful LLC v. Coca Cola Co.*, 2013 U.S. Dist. LEXIS 33501, at *14-*15 (C.D. Cal. Feb. 13, 2013) (applied to FAL and UCL claims). Here, FDA labeling regulations for OTC homeopathic drugs permit the marketing and sale of Defendants' products, and each of Plaintiffs' claims are an inappropriate assault on the safe harbor created by the FDA.

### F.    Plaintiffs' Claims Are Preempted

25.    Plaintiffs' claims are preempted by federal law, because a state may not "establish or continue in effect any requirement (1) that relates to the regulation of a[n OTC] drug…and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA. 21 U.S.C. § 379r; *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (implied preemption occurs "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ). Here, Plaintiffs' claims are preempted

because their claims: (1) relate to labeling that is FDA-compliant, and (2) impose non-identical standards for the effectiveness of OTC drugs.

## V.     **CONCLUSION**

26.    For each of the foregoing reasons, this Court rules in favor of Defendants and against Plaintiffs on Plaintiffs' equitable UCL and FAL claims.

Dated:    October 6, 2015

JEFFREY B. MARGULIES
STEPHANIE A. STROUP
SPENCER PERSSON
JADE F. JURDI
**NORTON ROSE FULBRIGHT US LLP**

_____/s/ Spencer Persson_____
SPENCER PERSSON
Attorneys for Defendants
STANDARD HOMEOPATHIC
COMPANY, STANDARD
HOMEOPATHIC LABORATORIES, INC.
and HYLAND'S, INC.

## PROOF OF SERVICE

I, Diana Cardenas, declare:

I am a citizen of the United States and employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 555 South Flower Street, Forty-First Floor, Los Angeles, California  90071.  On October 6, 2015, I served a copy of the within document(s):

**NOTICE OF LODGING [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO LOCAL RULE 52-3**

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW  PURSUANT TO LOCAL RULE 52-3**

☒    **(BY E-MAIL)** by transmitting via e-mail or other electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

| | |
|---|---|
| Ronald A. Marron, APLC | Gretchen M. Nelson |
| Skye Resendes | Stuart R. Fraenkel |
| LAW OFFICES OF RONALD A. MARRON, APLC | Gabriel S. Barenfeld |
| | KREINDLER & KREINDLER, LLP |
| 651 Arroyo Drive | 707 Wilshire Blvd., Suite 3600 |
| San Diego, California  92103 | Los Angeles, California  90017 |
| Tel:   619-696-9006 | Tel:   213-622-6469 |
| Fax:  619-564-6665 | Fax:  213-622-6019 |
| Emails:  ron@consumersadvocates.com,       skye@consumersadvocates.com, | Emails:  gnelson@kreindler.com, |
| | |
| ***Attorneys for Plaintiffs and the Proposed Class*** | ***Attorneys for Plaintiffs and the Proposed Class*** |

John H. Gomez
Deborah S. Dixon
Gomez Trial Attorneys
655 W. Broadway, Suite 1700
San Diego, CA  92101
Phone:  (619) 237-3490
Fax:  (619) 237-3496
Email:  john@gomeztrialattorneys.com
          ddixon@gomeztrialattorneys.com
***Attorneys for Plaintiffs***

DOCUMENT PREPARED ON RECYCLED PAPER

1

2    I am readily familiar with the firm's practice of collection and processing
3    correspondence for mailing.  Under that practice it would be deposited with the
     U.S. Postal Service on that same day with postage thereon fully prepaid in the
4    ordinary course of business.  I am aware that on motion of the party served, service
     is presumed invalid if postal cancellation date or postage meter date is more than
5    one day after date of deposit for mailing in affidavit.

6    I declare that I am employed in the office of a member of the bar of this court
     at whose direction the service was made.

7    Executed on October 6, 2015, at Los Angeles, California.

8

9                                              /s/ Diana Cardenas
10                                             Diana Cardenas

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28