JEFFREY B. MARGULIES, BAR NO. 126002
jeff.margulies@nortonrosefulbright.com
SPENCER PERSSON, Bar No. 235054
Spencer.persson@nortonrosefulbright.com
ANDY GUO, Bar No. 307824
Andy.guo@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
555 South Flower Street
Forty-First Floor
Los Angeles, California  90071
Telephone:   (213) 892-9200
Facsimile:    (213) 892-9494

Attorneys for Defendants
HYLAND'S, INC. and STANDARD
HOMEOPATHIC COMPANY

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| KIM ALLEN, et al. on behalf of themselves, all others similarly situated and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>HYLAND'S INC., et al.,<br><br>Defendants. | Case No.  12-cv-1150-DMG-MAN<br><u>CLASS ACTION</u><br><br>**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATING TO PLAINTIFFS' UNFAIR BUSINESS PRACTICES CLAIM PURSUANT TO LOCAL RULE 52-3** |

84062110.4

- 1 -

DOCUMENT PREPARED
ON RECYCLED PAPER

# I. FINDINGS OF FACT RELATING TO UNFAIR BUSINESS PRACTICES CLAIM UNDER CALIFORNIA UNFAIR COMPETITION LAW ("UCL")

## A. The Statements on the Product Labels.

1. The labeling for Calms Forté represents that the product is a "Sleep Aid" and "Relieves stress to help you sleep."

2. The labeling for Teething Tablets represents that the product "Provides Symptomatic Relief for Teething Children."

3. The labeling for Migraine Headache Relief represents that the product is "Safe & Effective" and "Relieves" "Pressure," "Throbbing," and "Light & Noise Sensitivity."

4. The labeling for Colic Tablets represents that the product provides "Symptomatic Relief for Colic in Children."

5. The labeling for Leg Cramps with Quinine represents that the product provides "Cramp Relief."

6. The labeling for Leg Cramps represents that the product helps "Relax Calf & Foot Cramps."

7. The labeling for Defend Cold & Cough represents that the product provides "Safe & Effective Relief" for "Nasal Congestion," "Cough," "Sore Throat," and "Sneezing."

8. The labeling for Defend Cold & Cough Night represents that the product provides "Safe & Effective Relief" for "Sleeplessness," "Congestion," "Cough," "Sore Throat," and "Sneezing."

9. The labeling for Hyland's Cough represents that the product provides "Safe & Effective Relief" for "Dry Cough," "Tickling Cough," and "Moist Cough."

DOCUMENT PREPARED ON RECYCLED PAPER

10.    The labeling for Seasonal Allergy Relief represents that the product is "Safe & Effective," and provides relief for "Itchy, Watery, eyes," "Sneezing," "Runny nose," and "Itchy nose & throat."

**B.    Named Plaintiffs' Testimony.**

11.    Named Plaintiff Kim Allen testified that she purchased Calms Forté, Leg Cramps with Quinine, Colic Tablets, and Migraine Headache Relief.  Allen testified that none of these products worked.  However, Allen also testified that not all drugs work for all people, that other drugs had not worked for her over time, and that she does not expect every medication to work for her every time.  She further testified that prescription medication was needed to ease her daughter's sleeplessness, which suggests a larger problem beyond what is likely to be remedied purchasing an over-the-counter sleep aid, such as Calms Forté.  Allen also testified that her daughter ultimately did not have colic, so Colic Tablets could not have worked.  With respect to Migraine Headache Relief, she testified that other over the counter medications did not improve her condition either.

12.    Named Plaintiff Daniele Xenos testified that she purchased Calms Forté, Leg Cramps, Migraine Headache Relief, and Teething Tablets.  Xenos testified that she cannot say one way or the other whether Calms Forté worked.  Teething Tablets worked for one of her children but not the other, and she still uses other homeopathic products with success.  While she did not believe that Migraine Headache Relief provided her with relief, she testified that nothing else worked either.  She also was dissatisfied with Leg Cramps, but she testified that she was suffering from other confounding medical conditions such as scoliosis and extreme nervousness, which could impact the effectiveness of any single medication.  She did not recall viewing the packaging of any of the products in the store.

13.    Named Plaintiff Sherrell Smith testified that she purchased Leg Cramps.  She testified that she had ongoing leg cramp issues, and had been

DOCUMENT PREPARED
ON RECYCLED PAPER

84062110.4

- 3 -

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW  RELATING TO PLAINTIFFS' UNFAIR BUSINESS
PRACTICES CLAIM PURSUANT TO LOCAL RULE 52-3

prescribed a muscle relaxant by a doctor that worked, indicating that her condition warrants more significant medical intervention than an over-the-counter remedy can provide.  She also testified that she has taken non-homeopathic sinus and allergy medications that did not work for her.

14.    Named Plaintiff Nancy Rodriguez testified that she purchased DEFEND Cold & Cough Night, Calms Forté, and Migraine Headache Relief.  She testified that she purchased them along with numerous other homeopathic remedies online, in bulk, and not based on any representations on the packaging.  Rodriguez is a trained nurse, and while she claims that defendants' products did not work, she swears by the effectiveness of a half-dozen other homeopathic products.

15.    Named Plaintiff Yuanke Xu testified that he purchased Hyland's Cough and Seasonal Allergy Relief.  The jury was left to conclude that both products worked for Xu.  While he claimed that they did not work, he admitted that he took both of the products, and his symptoms went away within a few hours, eliminating the need to take a second dose as directed four hours later.

16.    Named Plaintiff Diana Sisti testified that she purchased Migraine Headache Relief, Defend Cold & Cough, and Defend Cold & Cough Night.  With respect to the DEFEND Cold & Cough products, Sisti testified that her symptoms were flu-like, and therefore did not necessarily match those that the products are intended to treat.  She further testified that she purchased Migraine Headache Relief because she had a headache, and does not suffer from migraines.  She further testified that she does not share plaintiffs' counsels' theory that homeopathic products cannot work, and has taken other medications over time which have not worked for her but where she did not file a lawsuit.

17.    Named Plaintiff Melissa Nigh testified that she purchased Teething Tablets and Calms Forté for her two children.  She purchased several bottles of Teething Tablets for her two children even though she claims it did not work, and

even though her son's symptoms persisted for over two years, well beyond the time defendants recommend consultation with a doctor if the product does not work. She did not purchase Teething Tablets based on any representations on the labeling. She also purchased Calms Forté for her children, even though it is not intended for use with children.  She further admitted that she believes different people react differently to different medications.

### C.      Plaintiffs' Experts' Testimony.

18.     Plaintiffs did not conduct any testing of defendants' products to determine effectiveness.  Instead, plaintiffs argued that homeopathy is ineffective, relying on controverted expert testimony from their experts, Drs. Rose and Lee.

19.     Neither Dr. Rose nor Dr. Lee assisted plaintiffs in carrying their burden of proof that defendants' products cannot relieve symptoms, because both of them admitted that each product and its ingredients must be tested in order to reach a conclusion that it is not effective.  Both admitted that they had not tested defendants' products, and were not offering an opinion about those individual products.

20.     Dr. Rose and Dr. Lee also relied upon the lack of clinical trials on defendants' products.  However, both admitted that the lack of evidence, or results of the inconclusive studies, do not actually establish that the products are ineffective.

21.     For example, throughout the trial, plaintiffs argued that the Taylor study on Hyland's 4 Kids Cold 'n Cough product showed that all of defendants' products were not effective.  Dr. Taylor, one of three researchers who worked on the project, testified that the primary outcome measure did not show that the product was statistically more effective than a placebo, but he also testified that the study had design flaws and the results were not statistically significant.

DOCUMENT PREPARED ON RECYCLED PAPER

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW  RELATING TO PLAINTIFFS' UNFAIR BUSINESS PRACTICES CLAIM PURSUANT TO LOCAL RULE 52-3**

22.     On cross-examination, Dr. Rose testified that the Taylor study on Hyland's 4 Kids Cold 'n Cough could not show that the Defend Cold & Cough and Defend Cold & Cough Night products at issue in this matter were ineffective or that all homeopathic products were ineffective, because the study was insufficiently powered.  Dr. Rose also testified that the study, conducted in children, could not be applied to the products at issue in this case because a study conducted in children should not be applied to adults or products intended for adults.

23.     While Dr. Rose and Dr. Lee both opined that clinical trials did not support the conclusion that homeopathy in general was effective, they dismissed clinical trials, systematic reviews, meta-analyses, and *in vivo* and *in vitro* research that showed a positive effect for homeopathic drugs by concluding that they are flawed or that the investigators must be biased.

24.     Plaintiffs contended that the mechanism of action of homeopathic drugs is not known, but both Dr. Rose and Dr. Lee agreed that one does not need to know a mechanism of action in order to determine whether a drug is effective.

25.      Dr. Rose also admitted that whether homeopathic drugs can be effective is an ongoing scientific debate, and that reputable scientists believe homeopathy is effective.  He even when so far as to credit each of defendants' experts as a reputable scientist.

## D.     <u>Defendants' Experts' Testimony.</u>

26.     Defendants presented several expert witnesses discussing homeopathy, its history, its application, and supporting scientific theories.  Those experts discussed clinical trials, clinical experience, animal studies, and in vitro studies, all of which show that homeopathically prepared materials can have effects on living organisms and systems, and that those effects are not attributable to the placebo effect.

DOCUMENT PREPARED
ON RECYCLED PAPER

27.     The late Dr. Peter A.G. Fisher, the former Clinical Director, and the then-Director of Research at the Royal London Hospital for Integrated Medicine, with board-certification in rheumatology and accreditation in homeopathy, testified that homeopathy is a 200 year old school of medicine that is supported by contemporary scientific theory and testable models.  Dr. Fisher is a fully qualified doctor, treating and advising patients, including as the personal Physician to Her Majesty Queen Elizabeth II, as well as other members of the Royal Family.  Dr. Fisher testified that there are two main principles underlying homeopathy:  the principle of "similars" and the use of the minimum dose necessary to stimulate a beneficial response without causing toxic effect in a sick person.  The principle of similars espouses the theory that "like cures like."  This principle is in some ways analogous to the scientific underpinnings for flu shots that are widely disseminated each year.

28.     Dr. Fisher further explained that homeopathic remedies can be effective in treating symptoms, not by directly suppressing symptoms like conventional medicines, but by causing the body to adapt to and respond to a compound that causes those symptoms – much like the body reacts to a vaccine or an allergy shot.  Homeopathy strives for the minimum dose necessary to cause the body to adapt and respond.

29.     Dr. Fisher also explained that, in addition to the two hundred years of clinical experience of homeopathic physicians and practitioners, there are many clinical trials in which homeopathic treatments have shown a benefit, including numerous studies comparing a homeopathic treatment to placebo or conventional treatment.  Of approximately 300 published clinical trials, 45% were positive, 45% were inconclusive, and 10% were negative. Three of the four meta-analyses, and many of the systematic reviews of homeopathy have found homeopathic treatment is effective.

DOCUMENT PREPARED ON RECYCLED PAPER

30. Dr. Paolo Bellavite, a Professor of General Pathology in the Department of Pathology and Diagnostics at Verona University in Italy, testified that there is also a growing body of experimental evidence supporting the conclusion that homeopathically prepared materials have an effect on animals and on human cells. For example, mice given homeopathically prepared Gelsemium perform statistically differently than mice given a placebo in a standardized model for the evaluation of anti-anxiety drugs, and this is an outcome that cannot be attributed to the placebo effect. Homeopathic dilutions of histamine cause human basophils to reduce the allergic response, again an outcome that cannot be attributed to the placebo effect since psychological effects cannot occur in an isolated cell in the laboratory. And, homeopathically prepared materials can retain different electromagnetic properties, even when diluted to the point that no molecules of the "active ingredient" are expected to be found. These studies demonstrate that the active ingredients used in homeopathy can have effects which differ from a placebo, including in doses lower and higher that those used in defendants' products. Dr. Bellavite further testified regarding support in the scientific literature for the use of a number of the active ingredients in defendants' homeopathic products.

31. Dr. Bernardo A. Merizalde, a medical doctor with a thriving medical practice, testified that experienced medical doctors regularly prescribe homeopathic products, including those made by defendants, and their patients regularly experience considerable relief and clinical benefit from those drugs. Based on this direct experience, Dr. Merizalde showed that some physicians believe that homeopathic remedies like defendants' products can provide a preferable treatment regimen, in part because they have a greater safety profile than conventional drugs.

32. Dr. Iris Bell, a Professor at the University of Arizona in the Department of Family and Community Medicine and a Research Professor in the

- 8 -

College of Nursing (and defendants' Medical Director), testified about clinical trials she performed which established the efficacy of homeopathic remedies in patients with fibromyalgia, as well as showing that the EEG responses of patients were directly affected by sniffing homeopathically prepared medications.   Dr. Bell established that there is a growing understanding of the potential mechanism of action for homeopathic drugs.   Nanoparticle research is a relatively new area of science that has been proven to deliver minute quantities of medicine to cells in order to treat patients.   Nanoparticles are created in homeopathically-prepared medicines when they are triturated and succussed, and nanoparticles biosynthesized by plant extracts have demonstrated specific biological properties that can spur the body to respond.  Nanoparticles have been discovered in homeopathically prepared materials, even when they are so diluted that one would not expect to find any molecules of bulk materials.  According to Dr. Bell, this responds to one of the main criticisms of homeopathy, i.e., that "there is nothing there" and provides a plausible hypothesis for a mechanism of action for homeopathic drugs.

33.   Dr. Bell also testified that there was support in the traditional homeopathic literature —the Materia Medica—for the use of each ingredient in defendants' products for the purposes for which they were indicated on the labeling. The Materia Medica contains not only the results of "provings," the studies that show the toxic effects of the ingredients at high doses, but also the clinical experience of practitioners in treating patients with these active ingredients over the past 200 years.

34.   Dr. Bell further testified that the researchers who were involved in the 4 Kids Cough 'n Cold study conducted further analysis on the study's secondary outcome measures, presented those findings at a conference in Rome without defendants' prior knowledge, and found that the product was effective compared to a placebo.

35.     Additionally, Dr. Edward Calabrese, a Professor of Toxicology at the University of Massachusetts at Amherst, testified regarding dose response.  The effect of a drug or poison is generally directly related to the amount of the drug or poison that a person takes – the more of the drug, the greater the effect.  At higher doses, a drug or poison acts directly on the person's body to cause an effect.  At much lower doses, a completely opposite effect can occur, and a toxin can actually cause a beneficial response. This phenomenon is known as hormesis, a proven, scientific phenomenon that may explain why homeopathic drugs are effective in relieving symptoms.  In short, at the very low doses of active ingredients utilized in homeopathy, the body may be stimulated to induce an adaptive response and reverse the symptoms of illness.

36.     Defendants' expert Drs. Robbert van Haselen, a clinical epidemiologist and Editor-in-Chief of the scientific journal "Complementary Therapies in Medicine," testified that the Taylor study was inconclusive based on a number of factors, including that it was insufficiently powered.  Drs. van Haselen was the only expert to testify regarding the teething tablet study, concluding that it was inconclusive due to a number of factors, including its design and execution.  Drs. van Haselen opined that, at a minimum, the placebo and product should have tested as equally effective.  He also noted that one of the primary outcome measures of the study was how long it would take for a tooth to break through the gums, which has nothing to do with defendants' product or any symptomatic relief for teething pain.  In short, Drs. van Haselen found that neither study supported a conclusion that defendants' products were ineffective, or homeopathy cannot work.

## E.     Consumer Satisfaction Testimony.

37.     Defendants' Chairman and CEO, Dr. John P. Borneman, testified that defendants have been in business for more than 100 years, and that many of the products at issue have been on the market for quite some time.  He testified that the

DOCUMENT PREPARED ON RECYCLED PAPER

ingredients in the products were well known, understood, and effective based on 200 years of experience and practice, and therefore appear in publications accepted by the FDA such as the Homeopathic Pharmacopeia of the United States ("HPUS") and Materia Medica.  He further testified that the consumer feedback defendants receive is generally very positive, and that his family uses defendants' products. Borneman was clear that defendants' are proud of their homeopathic products, and see homeopathy as a key distinguishing feature in the marketplace that they want to highlight and want people to know about.  He testified that there is certainly no evidence of mass consumer dissatisfaction with defendants' products.

38.    Defendants' Vice President of Marketing, Thao Le, also testified about the positive consumer feedback that defendants receive, and that they make concerted efforts to educate their consumers about homeopathy and proactively attempt to educate and market to customers and prospective customers on social media.  She, too, testified that the products work for her and her family.

39.    Dr. David Stewart, Editor of a Peer Reviewed Journal titled the Journal of Public Policy and Marketing and a Professor of Marketing at Loyola Marymount University, testified that a survey conducted by defendants showed that 94% of defendants' actual customers were satisfied with defendants' products and believe that they work.

40.    Because of this evidence, and that presented by defendants' experts, plaintiffs could not prevail on their UCL unfair business practices claim, because they did not prove that defendants' conduct was "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."

DOCUMENT PREPARED ON RECYCLED PAPER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**F.** **Defendants' Compliance with FDA Labeling Regulations and Compliance Policy Guide for Homeopathic Over-The-Counter Drugs**

41.     Testimony from multiple witnesses, including Dr. Borneman, longtime FDA compliance officer Edward Miracco, and defendants' Vice President of Marketing, Thao Le, established that the Food and Drug Administration ("FDA") regulates the sale of all over-the-counter ("OTC") drugs, including homeopathic drugs, that are manufactured, marketed, and sold in this country.

42.     Dr. Borneman explained that the Homeopathic Pharmacopoeia Convention publishes and updates the Homeopathic Pharmacopoeia of the United States ("HPUS"), a publication that lists recognized homeopathic remedies and ingredients.  The HPUS will not list any remedy or ingredient without evidence of its safety and efficacy from traditional homeopathic literature or studies.

43.     Dr. Borneman and Mr. Miracco further testified that the United States Food, Drug, and Cosmetic Act ("FDCA") recognizes as official the remedies and standards in the HPUS.  This recognition was first adopted by Congress in 1938. The FDCA was further amended in 1962.  The amendment required all "new" drugs to be approved by the FDA as safe and effective.  Drugs that were on the market at the time of the 1962 amendments were "grandfathered" from the new drug approval process, subject to the FDA's later review at some undisclosed time to ensure that they were safe and effective.  This included all OTC drugs on the market at the time.

44.     Mr. Miracco also established that, in 1972, the FDA commenced the OTC Drug Review process, intended to evaluate all OTC drugs that were on the market, by category of products. The FDA reserved consideration of homeopathic drugs until after the monographs for conventional OTC drugs were completed, and has not to date commenced review of homeopathic drugs.

DOCUMENT PREPARED
ON RECYCLED PAPER

45.    Dr. Borneman, Ms. Le, and defendants' Medical Director, Dr. Iris Bell, established that all of the ingredients used in all of defendants' products are listed in the HPUS.  Dr. Borneman testified that defendants were founded in 1903 as a company manufacturing homeopathic drugs for consumers who were looking for a safe, natural alternative to traditional medications.  Defendants continue to manufacture products for this same reason to this day, and defendants' pharmacists create the formulas for their products based on the remedies and ingredients included in the HPUS.  As such, defendants' products are recognized as drugs by the FDCA.

46.    Mr. Miracco testified that the FDA does not require manufacturers like defendants to conduct randomized controlled trials to demonstrate that OTC drugs that were on the market in 1972, including homeopathic drugs, are effective.  The FDA also does not require or expect that an OTC drug, including a homeopathic drug, be 100 percent effective.  Rather, the FDA requires that a significant proportion of the target population will experience relief after using the products as directed and for the indicated use.

47.    Mr. Miracco and Ms. Le further testified that the FDA also regulates the marketing and labeling of all over-the-counter drugs, including homeopathic drugs.  The labeling for homeopathic drugs must comply with the following guidelines:  (1) the homeopathic product must include at least one indication for use on the label or packaging; and, (2) the homeopathic product must list the ingredients of the product on the packaging.  See Tr. Ex. 296.  Mr. Miracco testified that in 1998 FDA adopted a Compliance Policy Guide governing the marketing of OTC homeopathic drugs. So long as homeopathic drugs comply with the labeling regulations and Compliance Policy Guide, the FDA permits the marketing and sale of homeopathic drugs like those at issue in this matter.

DOCUMENT PREPARED ON RECYCLED PAPER

48.   Ms. Le confirmed that all of defendants' products comply with FDA regulations relating to labeling.  Plaintiffs did not dispute this.

## II.   CONCLUSIONS OF LAW

### A.   Applicable Law.

1.   The test for violation of the UCL's "unfair" prong in consumer actions has been unsettled since the California Supreme Court's opinion in *Cel–Tech Comms, Inc. v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527 (Cal. 1999). California courts of appeal are split over three different tests for unfair acts in consumer UCL actions: (1) a "balancing" test (substantially derived from one of the disapproved cases, *People v. Casa Blanca Convalescent Homes*, 206 Cal. Rptr. 164 (Cal. Ct. App. 1984); (2) a test derived from the Federal Trade Commission (the "FTC test"); and (3) the "tethering" to law test set forth in *Cel-Tech*. *See Drum v. San Fernando Valley Bar Ass'n,* 106 Cal. Rptr. 3d 46, 53 (Cal. Ct. App. 2010).

2.   The Ninth Circuit has acknowledged that "California courts have not yet determined how to define 'unfair' in the consumer action context after *Cel–Tech*." *Lozano v. AT&T Wireless Servs. Inc.,* 504 F. 3d 718, 736 (9th Cir. 2007). However, *Lozano* rejected the FTC test in consumer actions. *Id.*

3.   Under the tethering test, "the public policy which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions." *Drum,* 106 Cal. Rptr. 3d at 53 (citing *Bardin v. DaimlerChrysler Corp*., 39 Cal. Rptr. 3d 634, 636 (Cal. Ct. App. 2006)).

4.   *Cel-Tech* noted, "Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs

may not use the general unfair competition law to assault that harbor." *Cel–Tech,* 973 P.2d at 541.

5.     The Ninth Circuit has invoked the safe harbor to protect conduct authorized by regulation, in addition to legislation. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F. 3d 1152, 1169 & n. 8 (9th Cir. 2012) ("California intermediate courts agree with our conclusion that regulations can create safe harbors"); *see also Barber v. Nestlé USA, Inc.*, 154 F. Supp. 3d 954, 961-62 (2015) (manufacturer who complied with limited disclosure requirements in California's Transparency in Supply Chains Act need not do more). Other district courts have followed this line of reasoning to apply the safe harbor to FDA regulations authorizing the challenged conduct. *See Pom Wonderful LLC v. The Coca Cola Co.*, 2013 WL 543361, *5-6 (C.D. Cal. 2013)

6.     Under the balancing test, a court must determine whether the alleged business practice "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Drum,* 106 Cal. Rptr. 3d at 53.

**B.     <u>Plaintiffs' unfair business practices case was expressly based on their misrepresentation theory.</u>**

7.     Plaintiffs' Third Amended Complaint (ECF No. 198) cabined their unfair business practices in their deception claim: "Plaintiffs assert violation of the public policy of engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of the UCL." *Id.* ¶ 231.

8.     In certifying the class, the Court limited the claims to plaintiffs' theory of liability that the active ingredients are so diluted as to render the products

entirely ineffective. Order re: Motion for Class Certification at 4, n. 5 (ECF No. 291).

9.     The final pretrial conference order and plaintiffs' associated briefing demonstrate that the unfair UCL claim was premised entirely on their deception claim. In discussing their UCL claim, plaintiffs' Memorandum of Contentions of Fact and Law (ECF No. 337) focused solely and specifically on "advertising statements which: (1) were untrue or misleading . . . . Plaintiffs will rely on defendants' own statements on its products' labels, packaging and advertisements to demonstrate violations of sections 17200 and 17500." *Id.* at 10.

10.     The Final Pretrial Conference Order (ECF No. 382) identified plaintiffs' UCL unfair claim as "business conduct that was unfair by either violating an applicable law or violating the public policy or spirit of unfair business competition law by engaging in false or misleading advertising," and that plaintiffs would not have purchased the products "but for the false or deceptive advertising." *Id.* at 4.

11.     Plaintiffs' Trial Brief (ECF No. 383) asserted that they would establish their UCL unfair claim by establishing that defendants "engaged in business conduct that was unfair by either violating an applicable law or violating the public policy or spirit of unfair business competition law by engaging in false or misleading advertising; and . . . Plaintiffs suffered injury by purchasing products they would not have purchased but for the false or deceptive advertising." *Id.* at 6.

12.     "[W]here the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Shin v. Campbell Soup Co.*, 2017 WL 3534991 *7-8 (C.D. Cal. 2017) (*citing Hadley v. Kellogg Sales Co.,* 243 F. Supp. 3d 1074, 1104-05 (N.D. Cal. 2017)).

**C.**   **Plaintiffs did not show a violation of public policy tethered to a constitutional, statutory, or regulatory provision.**

13.   "[W]here a claim of an unfair act or practice is predicated on public policy, we read *Cel–Tech* to require that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." *Gregory v. Albertson's, Inc.*, 128 Cal. Rptr. 2d 389, 395 (Cal. Ct. App. 2002). Here, because plaintiffs' claims involved the conditions under which over-the-counter drugs are marketed, and because the FDA is responsible for determining the conditions under which over-the-counter drugs may be marketed as well as the appropriate labeling for such products under the Federal Food, Drug & Cosmetic Act and its implementing regulations, the use of the "tethering" test is appropriate.

14.   Plaintiffs' evidence was directed toward the issue of whether homeopathic drugs were effective as a whole. They did not, however, establish that by selling the products defendants violated any public policy tethered to statutory or regulatory provisions relating to the marketing and sale of over-the-counter homeopathic drug products.

15.   Defendants, however, submitted ample evidence to show that it complied in all respects with applicable regulations and FDA guidance. Unrebutted testimony from multiple witnesses, including Dr. Borneman, Mr. Miracco, and Ms. Le, established that the FDA regulates the sale of all OTC drugs, including homeopathic drugs, that are manufactured, marketed, and sold in this country, and that defendants were in compliance with applicable FDA regulations and guidance.

**D.**   **Defendants' compliance with applicable FDA regulations and compliance policy precludes liability under the safe harbor.**

16.   *Cel-Tech* holds that compliance with legislative direction constitutes a safe harbor from a finding of unfair business practices, and courts have extended

DOCUMENT PREPARED ON RECYCLED PAPER

that safe harbor to regulations and even informal regulatory actions. Defendants' compliance with FDA's labeling regulations and the Compliance Policy Guide governing the marketing of homeopathic drugs in the context of the OTC Drug Review process establishes a safe harbor from liability for unfair business practices. See *Pom Wonderful*, 2013 WL 543361 at *5-6.

**E.    Defendants did not commit unfair business practices under the balancing test.**

17.    The California Supreme Court's disapproval of this test (*Cel-Tech*, 973 P.2d at 564), combined with the applicable regulatory framework applicable to over-the-counter drug products, renders the balancing test inapplicable to this case. However, even to the extent that plaintiffs assert that defendants committed an unfair business practice by selling homeopathic drugs that were not effective, and to the extent that the jury's implied findings on the effectiveness issue are not binding on the Court, the totality of the evidence does not support a liability finding under the balancing test, either.

18.    In contrast to plaintiffs' evidence on effectiveness, defendants submitted expert testimony on clinical trials, clinical experience, animal studies, and in vitro studies, all of which show that homeopathically prepared materials can have effects on living organisms and systems, and that those effects are not attributable to the placebo effect.

19.    In summary, the evidence showed – and plaintiffs' expert Dr. Rose agreed – that there was a scientific controversy over the effectiveness of homeopathic drugs. The Court's original Findings of Fact and Conclusions of Law stated, "[t]he evidence presented at trial demonstrated that the issue which the Court certified for class treatment continues to be the subject of scientific debate and plaintiffs failed to present evidence of definitive scientific research to meet their

DOCUMENT PREPARED
ON RECYCLED PAPER

burden of proof as to the products at issue." Findings of Fact and Conclusions of Law (Aug. 16, 2016), at 3 (ECF No. 471).

20.     The evidence further showed that consumers were highly satisfied with defendants' products, and that defendants complied with FDA's labeling requirements, the OTC Drug Review process, and FDA's guidance for marketing of homeopathic drugs.

21.     Under these circumstances, defendants' conduct was not "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and thus there is no basis for a finding of unfair business practices on this record.

## III.   CONCLUSION

22.     For each of the foregoing reasons, this Court rules in favor of defendants and against plaintiffs on plaintiffs' unfair business practices claim.

Dated:  October 2, 2019                JEFFREY B. MARGULIES
                                       SPENCER PERSSON
                                       ANDY GUO
                                       **NORTON ROSE FULBRIGHT US LLP**



                                       By_____/s/ Jeffrey Margulies_____
                                            JEFFREY MARGULIES
                                       Attorneys for Defendants
                                       HYLAND'S, INC. and STANDARD
                                       HOMEOPATHIC COMPANY

84062110.4

DOCUMENT PREPARED
ON RECYCLED PAPER