**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
MICHAEL T. HOUCHIN (SBN 305541)
*mike@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

**NELSON & FRAENKEL LLP**
GRETCHEN M. NELSON (112566)
*gnelson@nflawfirm.com*
601 So. Figueroa Street, Suite 2050
Los Angeles, California 90017
Telephone: (213) 622-6469
Facsimile: (213) 622-6019

**GOMEZ TRIAL ATTORNEYS**
JOHN H. GOMEZ (171485)
*jgomez@gomeztrialattorneys.com*
DEBORAH S. DIXON (248965)
*ddixon@gomeztrialattorneys.com*
655 W. Broadway Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
Facsimile: (619) 237-3496
*Class Counsel*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| KIM ALLEN, et al., on behalf of themselves, all others similarly situated and the general public,<br><br>       Plaintiffs,<br><br>   v.<br><br>HYLAND'S, INC., et al.,<br><br>       Defendants. | Case No: 12-cv-1150-DMG-MAN<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Judge:    Honorable Dolly M. Gee |

# I.  **PROCEDURAL HISTORY**

1.      The Third Amended Complaint, the operative complaint, was filed on May 3, 2013. (Doc. No. 203.)

2.      The Answer to the Third Amended Complaint was filed on May 13, 2013.

3.      This Court granted certification of a class on August 1, 2014 defining the Class as follows:

> All purchasers of Hyland's, Inc. and Standard Homeopathic Company's homeopathic Products entitled Calms Forté, Teething Tablets, Migraine Headache Relief, Colic Tablets, Leg Cramps with Quinine, Leg Cramps, Defend Cold & Cough, Defend Cold & Cough Night, Hyland's Cough, and Seasonal Allergy Relief for personal or household use and not for resale, in the United States from the period of February 9, 2008 to the present (the "Class Period"). Excluded from the Class are (1) governmental entities; (2) Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries and assigns; (3) the judicial officers and their immediate family members and associated court staff assigned to this case; and (4) individuals who have fraud-based UCL claims with respect to Colic Tablets and Leg Cramps with Quinine.

(Doc. No. 291, Order Re Plaintiffs' Motion for Class Certification at p. 42.)

4.      Notice to the Class pursuant to the Court's Notice Order (Doc. No 299) commenced on October 8, 2014.

5.      Trial in this matter started on September 1, 2015 and concluded with a jury verdict in Defendants' favor on September 18, 2015.

6.      The Court and jury, as the triers of fact, heard evidence relating to the following claims: Claim 1 breach of express warranty; Claim 2 violation of Consumer Legal Remedies Act ("CLRA"); Claim 3 violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and Claim 4 violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.* (Doc. No. 382, Pretrial Conference Order, ¶ 7.)

---

1

7.     On May 15, 2019, the Ninth Circuit Court of Appeals entered its Memorandum Opinions affirming in part and reversing in part the Judgment. (Doc. No. 501). The Ninth Circuit affirmed the Judgment as to the CLRA, Magnuson-Moss Warranty Act and FAL claims and reversed as to the UCL claim holding that "[t]he UCL's prohibition of unfair business practices sweeps more broadly than the CLRA, Magnuson-Moss Warranty Act, or express warranty" and that "[t]he jury's narrow findings as to deceptive advertising do not resolve [Plaintiffs'] broader unfair practices theory." (Doc. No. 501 at 6-7). The Ninth Circuit further held "that the district court must engage in fact-finding to resolve this claim." (Doc. No. 501 at 7). The Ninth Circuit remanded for further proceedings consistent with its Order. (Doc. No. 501 at 7.)

8.     Pursuant to a Joint Status Report filed by the parties, the Court issued its Minute Order on July 8, 2019, directing the parties to file simultaneous opening findings of fact and conclusions of law and any associated memorandum of law in support thereof by September 30, 2019.[1]

## II.   **FINDINGS OF FACT**

### *The Parties*

9.     The term "Plaintiffs" shall mean Kim Allen, Daniele Xenos, Sherrell Smith, Nancy Rodriguez, Yuanke Xu, Diana Sisti and Melissa Nigh. (Doc. No. 382, ¶ 1.)

10.     The term "Defendants" when used herein refers to both Hyland's Inc. and Standard Homeopathic Company. Standard Homeopathic Company is liable for all acts and conduct of Hyland's Inc. Defendants market and sell homeopathic products throughout the United States. (Doc. No. 291, at p. 2.)

---

[1] On September 30, 2019, the parties filed a stipulation requesting a short two day continuance of the filing of the initial documents. (Doc. No. 506.). On September 20, 2019, the Court granted the parties' stipulation (Doc. No. 507).

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

11.     The term "Product" or "Products" shall mean Calms Forte, Teething Tablets, Migraine Headache Relief, Colic Tablets, Leg Cramps (and Leg Cramps with Quinine), Defend Cold & Cough, Defend Cold & Cough Night, Hyland's Cough, and Seasonal Allergy Relief. (Doc. No. 382, ¶ 5.)

*Each of the Named Plaintiffs Purchased Defendants' Products*

12.     Plaintiff Kim Allen purchased Defendants' Products, specifically Calms Forte (Trial Ex. 42-33), Leg Cramps with Quinine (Trial Ex. 42-29) and Migraine Relief (Trial Ex. 1012). (09/04/2015 Trial Tr. Morning Session (Allen) 44:18-19 and 59:7-8.)

13.     Plaintiff Daniele Xenos purchased Defendants' Leg Cramps with Quinine Product. (09/10/2015 Depo. Tr. 71:12-21.)

14.     Plaintiff Sherrell Smith purchased Defendants' Leg Cramps Product. (09/04/2015 Trial Tr. Morning Session (Smith) 12:5-9; Trial Ex. 6.)

15.     Plaintiff Nancy Rodriguez purchased Defendants' Products, specifically Defend Cold & Cough Night, Calms Forte and Migraine Headache Relief. (09/10/2015 Depo. Tr. 58:6-9; 78:17-79:8.)

16.     Plaintiff Yuanke Xu purchased Defendants' Products, specifically Hyland's Cough and Seasonal Allergy Relief. (09/09/2015 Trial Tr. Morning Session (Xu) 13:24-14:1; Trial Exs. 1019 and 42-16.)

17.     Plaintiff Diana Sisti purchased Defendants' Products, specifically Defend Cold & Cough Day, Defend Cold & Cough Night and Migraine Relief. (09/04/2015 Trial Tr. Morning Session (Sisti) 96:5-6, 97:7-20, 101:23-102:5; Trial Exs. 1016-1017 and 1012.)

18.     Plaintiff Melissa Nigh purchased Defendants' Products, specifically Calms Forte and Teething Tablets. (09/03/2015 Trial Tr. Afternoon Session (Nigh) 81:21-82:7, 82:19-22; Trial Exs. 203, 15, 42-37 and 42-38.)

19.     Defendants represent to consumers that their Calms Forte Product will relieve stress to help the consumer sleep and the consumer will wake up rested and

3

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

refreshed. (Trial Exs. 42-33, 203, 1010-1 and 1010-2.) Defendants also represent that Calms Forte has specific active ingredients in specific quantities. (Trial Exs. 203 and 1010-2.)

20.     Defendants represent to consumers that their Leg Cramps Product will stop the pain caused by leg cramps. (Trial Exs. 6, 42-29 and 42-30.) Defendants also represent that Leg Cramps Product has specific active ingredients in specific quantities. (Trial Exs. 42-30 and 1010-2.)

21.     Defendants represent to consumers that their Migraine Relief Product will relieve pressure, throbbing, light and noise sensitivity and that the product is "effective." (Trial Ex. 1012-1.) Defendants also represent that Migraine Relief has specific active ingredients in specific quantities. (Trial Ex. 1012-2.)

22.     Defendants represent to consumers that their Defend Cold & Cough Day Product is "effective" for relief of nasal congestion, cough, sore throat and sneezing. (Trial Ex. 1016-1.) Defendants also represent that Defend Cold & Cough Day Product has specific active ingredients in specific quantities. (Trial Ex. 1016-2.)

23.     Defendants represent to consumers that their Defend Cold & Cough Night Product is "effective" for relief of sleeplessness, congestion, cough, sore throat and sneezing. (Trial Ex. 1017-1.) Defendants' also represent that Defend Cold & Cough Night Product has specific active ingredients in specific quantities. (Trial Ex. 1017-2.)

24.     Defendants represent to consumers that Hyland's Cough Product will provide relief for coughs. (Trial Ex. 42-15 and 42-16.) Defendants also represent Hyland's Cough Product to have specific active ingredients in specific quantities. (Trial Ex. 42-16.)

25.     Defendants represent to consumers that their Seasonal Allergy Relief Product is "effective" and will relieve itchy, watery eyes, sneezing, runny nose, itchy nose and throat. (Trial Ex. 1019-1.) Defendants also represent Seasonal Allergy

4

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Relief Product to have specific active ingredients in specific quantities. (Trial Ex. 1019-2.)

26.    Defendants represent to consumers that their Teething Tablets Product provides relief for teething children. (Trial Exs. 15, 42-37 and 42-38.) Defendants also represent Teething Tablets Product has specific active ingredients in specific quantities. (Trial Exs. 15, 42-37 and 42-38.)

27.    Defendants did not conduct a randomized controlled trial to test their Calms Forte Product to determine if it was effective prior to telling consumers the Product was effective. At the time of trial, Defendants had not conducted a randomized controlled trial to determine if the Calms Forte Product was effective. (09/02/2015 Trial Tr. Afternoon Session (Borneman) 34:22-35:5; 09/08/2015 Trial Tr. Afternoon Session (Phillips) 11:5-10.)

28.    Defendants did not conduct a randomized controlled trial to test their Leg Cramps (with or without quinine) Products to determine if the Leg Cramps Products were effective prior to telling consumers the Products were effective. At the time of trial, Defendants had not conducted a randomized controlled trial to determine if the Leg Cramps Products were effective. (09/02/2015 Trial Tr. Morning Session (Borneman) 128:7-129:11; 09/02/2015 Trial Tr. Afternoon Session (Borneman) 34:22-35:5; 09/08/2015 Trial Tr. Afternoon Session (Phillips) 11:5-10.)

29.    Defendants did not conduct a randomized controlled trial to test their Migraine Relief Product to determine if it was effective prior to telling consumers the Product was effective. At the time of trial, Defendants had not conducted a randomized controlled trial to determine if the Migraine Relief Product was effective. (09/02/2015 Trial Tr. Afternoon Session (Borneman) 34:22-35:5; 09/08/2015 Trial Tr. Afternoon Session (Phillips) 11:5-10.)

30.    Defendants did not conduct a randomized controlled trial to test their Hyland's Cough Product to determine if it was effective prior to telling consumers the Product was effective. At the time of trial, Defendants had not conducted a

randomized controlled trial to determine if the Hyland's Cough Product was effective. (09/02/2015 Trial Tr. Afternoon Session (Borneman) 34:22-35:5; 09/08/2015 Trial Tr. Afternoon Session (Phillips) 11:5-10.)

31.     Defendants did not conduct a randomized controlled trial to test their Seasonal Allergy Relief Product to determine if it was effective prior to telling consumers the Product was effective. At the time of trial, Defendants had not conducted a randomized controlled trial to determine if the Seasonal Allergy Relief Product was effective. (09/02/2015 Trial Tr. Afternoon Session (Borneman) 34:22-35:5; 09/08/2015 Trial Tr. Afternoon Session (Phillips) 11:5-10.)

32.     Defendants did not conduct a randomized controlled trial to test their Teething Tablets Product to determine if it was effective prior to first telling consumers the Product was effective. (09/02/2015 Trial Tr. Afternoon Session (Borneman) 75:7-13; 09/08/2015 Afternoon Session (Le) Trial Tr. 81:9-21.)

33.     Defendants did not conduct any clinical testing, including a randomized controlled trial, to test their Defend Cold & Cough (night and day) Products to determine if those Products were effective prior to telling consumers the Products were effective. ((09/02/2015 Trial Tr. Afternoon Session (Borneman) 34:22-35:5; 09/08/2015 Trial Tr. Afternoon Session (Phillips) 10:18-11:5-10.)

34.     Defendants had conducted a randomized controlled trial on their Teething Products in 2006 and learned the placebo performed better than the actual Product, meaning the Teething Tablets were not effective in providing relief any more than a placebo. (09/02/2015 Morning Session (Borneman) Trial Tr. 113:24-25; Trial Ex. 74-1; 9/3/2015 Morning Session (Borneman) Trial Tr. 41:18-42:6 (the placebo worked better than Teething Tablets.)

35.     Defendants hired Dr. James Taylor from University of Washington to conduct a randomized controlled trial to determine if the Cold & Cough for Kids product was effective at relieving the symptoms stated on the package. The study demonstrated the placebo did better than Defendants' product and that the product

6

did not relieve symptoms as stated, within the time period tested. (Taylor Depo, 06/19/2014 at p. 22:19-23-:3, 108:22-109:1, 113:14-24; 09/10/2015 Trial video; Trial Ex. 191.)

36.    Dr. Taylor testified with respect to all four primary outcomes he set out to measure and confirmed that Defendants' product did not show any effect that was different from a placebo. (Taylor Depo, 06/19/2014 at p. 104:8-12; 09/10/2015 Trial video.)

37.    The products tested by Dr. Taylor are pharmacologically the same Products as the Defend Cold & Cough (night and day) Products at issue in this case. (09/01/2015 Trial Tr. Afternoon Session (Borneman) 69:23-25; 72:4-5.)

38.    Prior to making representations to consumers and selling and advertising their Products, Defendants did not know how their Products biologically could help Plaintiffs' medical conditions or ailments. (09/10/2015 Trial Tr. Afternoon Session (Bell) 91:21-92:4; 105:1-8; 09/14/2015 Trial Tr. Afternoon Session (Fisher) 9:11-24.)

39.    Defendants' marketing department decided what ingredients would be used in a product. (09/08/2015 Trial Tr. Afternoon Session (Phillips) 112:2-6; 114:23-115:1.)

40.    After making representations to consumers and selling and advertising their Products, Defendants still do not know how their Products biologically could help Plaintiffs' medical conditions or ailments. (09/10/2015 Trial Tr. Afternoon Session (Bell) 91:21-92:4: 105:1-8; 09/14/2015 Trial Tr. Afternoon Session (Fisher) 9:11-24.)

41.    Prior to making representations to consumers and selling and advertising their Products, Defendants did not have medical testing to prove their Products could biologically help Plaintiffs' medical conditions or ailments. (09/02/2015 Trial Tr. Afternoon Session (Borneman) 34:22-35:5; 09/08/2015 Trial Tr. Afternoon Session (Phillips) 11:5-10.)

42.     Prior to making representations to consumers and selling and advertising their Products, Defendants did not have medical testing to prove their Products could be effective in relieving Plaintiffs' symptoms or ailments. (09/02/2015 Trial Tr. Afternoon Session (Borneman) 34:22-35:5; 09/08/2015 Trial Tr. Afternoon Session (Phillips) 11:5-10.)

43.     Defendants' labels on their Products do not explain to consumers how the Products are manufactured. (09/08/2015 Trial Tr. Afternoon Session (Le) 77:21-78:9; 79:6-8.)

44.     Defendants could have chosen to explain homeopathy to its consumers on the labels of their Products, but did not. (09/08/2015 Trial Tr. Afternoon Session (Le) 78:17-21.)

45.     Defendants' labels on their Products do not explain to consumers the dilutions or quantity of active ingredients in each serving. (09/08/2015 Trial Tr. Afternoon Session (Le) 77:24-78:9.)

46.     Defendants' labels on their Products do not tell consumers the Products are made with 99.9% inactive ingredients. (09/08/2015 Trial Tr. Afternoon Session (Phillips) 7:4-9:18.)

47.     Defendants' labels on their Products do not tell consumers the Products have .19 milligrams of active ingredients. (09/08/2015 Trial Tr. Morning Session (Phillips) 120:13-21.)

48.     Defendants' labels on their Products do not tell consumers it does not matter if the consumer ingests the entire box of product because the dosage of the product does not matter and a consumer's weight and age have no bearing on the dosage of Defendants' Products. (09/2/2015 Trial Tr. Afternoon Session (Borneman), 59:17-20; 61:6-8; 99:24-100:9.)

49.     Defendants' labels on their Products do not disclose the findings of United States governmental agencies, including the Food & Drug Administration or National Health Institute's findings that there is little to no scientific evidence to

8

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

support the underpinnings of homeopathy. (09/08/2015 Trial Tr. Afternoon Session (Le) 70:5-13; Trial Ex. 296-2.)

50. Defendants' Products do not have ingredients to provide medical relief as advertised because of the diluted levels of the ingredients. (09/04/2015 Trial Tr. Afternoon Session (Dr. Rose) 27:1-23; 98:15-16 "Well, with respect to the products that are under consideration and of concern in this – in this event, it is my opinion that there is no sound scientific or medical evidence that they provide any benefit to patients with medical conditions such as those described and indicated on the labels, beyond the placebo effect.")

51. Dr. Noel Rose, a medical doctor, Ph.D. and the Director for the Center for Autoimmune Disease Research at Johns Hopkins Bloomberg School of Public Health, testified homeopathy does not work because when it has been put to trial, the overwhelming preponderance of evidence is that it does not work as advertised. (9/4/2015 Trial Tr. Afternoon Session, (Rose) 79:21-24 and 80:3-18.).

52. Dr. Robert Lee, Ph.D., a professor of pharmaceutics and pharmaceutical chemistry at the College of Pharmacy at Ohio State University, testified that there are not enough nanoparticles present to make Defendants' homeopathic remedies effective. (Doc. No. 459, 9/6/2015 Trial Tr. (Lee) 78:16-83:18-23, "Q:… do you have an opinion that trace amount of nanoparticles that are generated during homeopathic manufacturing would have any effect on the efficacy of the ingredients in the products at issue here? A: It's my opinion that they would have no impact, those so-called active ingredients.")

53. Defendants' main expert, Dr. Fisher, did not test the Hyland's products and could not actually opine that the Hyland's Products are effective. (Doc. No. 450, 9/14/2015 Afternoon Session (Dr. Fisher) Trial Tr. 8:10:14; 18:16-19). Dr. Fisher also could not testify how any of the ingredients in the Products work. (Doc. No. 450, 9/14/2015 Afternoon Session (Dr. Fisher) Trial Tr. 9:15-24). Rather, he admitted that the efficacy of homeopathic remedies is merely theoretical: "the

9

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

definitive answer of how [homeopathic products] work is not answered but there are certainly theories of how they might work." (Doc. No. 450, 9/14/2015 Afternoon Session (Dr. Fisher) Trial Tr. 11:3-8.)

54.     Defendants' own medical director, Dr. Iris Bell, admitted that there are no definitive studies on any of the Products to support that they relieve symptoms as promised. (Doc. No. 448, 9/10/2015 Afternoon Session (Dr. Bell) Trial Tr. 63:5-10.)

55.     Defendants' expert, Dr. Calabrese, admitted that he did not test the Products to confirm whether the concept of hormesis applies to them in any way and he had no knowledge of the Products at issue in this case. (Doc. No. 464, Trial Tr. 24:4-25:1.)

56.     While Defendants' expert Dr. Paolo Bellavite testified that laboratory studies demonstrate that homeopathic medicines include measurable and quantifiable amounts of active ingredients, he did not testify about any of the specific Products at issue, which he admittedly did not test. (Doc. No. 463, 9/16/2015 Morning Session (Dr. Bellavite) Trial Tr. 70:5-22). Dr. Bellavite also conceded that even assuming the existence of molecules of an active ingredient in a product, a clinical study would be needed to prove efficacy. (Doc. No. 463, 9/16/2015 Morning Session (Dr. Bellavite) Trial Tr. 87:24-88:5.)

57.     Another of Defendants' experts, Dr. Bernardo Merizalde, is a psychiatrist who practices integrative medicine. (Doc. No. 461, 9/11/2015 Morning Session (Dr. Merizalde) Trial Tr. 97:4-18.) His patients are individuals suffering from psychosomatic conditions. (Doc. No. 461, 9/11/2015 Morning Session (Dr. Merizalde) Trial Tr. 103:6-17.) Dr. Merizalde admitted that it is his duty to maximize the placebo response in his patients when administering homeopathic products. (Doc. No. 449, 9/11/2015 Afternoon Session (Dr. Merizalde) Trial Tr. 9:9-18.) Thus, any effectiveness he attributed to Hyland's Products was inextricably intertwined with the placebo effect.

58.     The United Kingdom's House of Commons Science and Technology Committee found there is no scientific evidence to support a claim that homeopathy works and that the systematic reviews and other meta-analyses conclusively demonstrated that homeopathic products perform no better than placebos, information not disclosed to consumers. (Trial Ex. 84-23.)

59.     The Australian Government's National Health & Medical Research Council (the "NHMRC") found that homeopathy is not an effective treatment. (Trial Ex. 409-6.)

60.     The National Center for Complementary and Integrative Health which is a division of the United States Department of Health and Human Services, has reported publicly "there is little evidence to support homeopathy as an effective treatment for any specific condition." (Trial Ex. 139-1.)

61.     Defendants' labels do not identify The National Center for Complementary and Integrative Health's position that "there is little evidence to support homeopathy as an effective treatment for any specific condition." (Trial. Ex. 139.)

62.     Defendant's labels on their Products do not identify the Food & Drug Administration's position that "the FDA is not aware of scientific evidence to support homeopathy as effective." (Trial Ex. 197.)

63.     Defendants' labels on their Products do not offer a money-back guarantee or explain to consumers how to obtain a refund if they are dissatisfied with the Product(s). (09/08/2015 Trial Tr. Afternoon Session (Le) 93:4-12.)

64.     Defendants' Chief Executive Officer, John Borneman, was aware that most consumers are not knowledgeable about homeopathic products or actually know they have purchased a homeopathic product, including Defendants' Products. (Trial Ex. 51-3, Blackie Memorial Lecture.)

65.     Defendants' Chief Executive Officer, John Borneman, had knowledge that many consumers were confused about purchasing homeopathic products. (Trial

11

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ex. 51-4, Blackie Memorial Lecture; 09/02/2015 Trial Tr. Morning Session (Borneman) 42:4-6.)

66.    The United States Government, by the Staff at the Federal Trade Commission, after a vote by the Commission to adopt the Staff's Comments, determined consumers mistakenly believe manufacturers of homeopathic products tested their products on people to show their effectiveness. (Trial Ex. 406-15.)

67.    Defendants' Chief Executive Officer, John Borneman, expected consumers to read the Products' label prior to purchase. (09/01/2015 Trial Tr. Afternoon Session (Borneman) 91:19-93:19.)

68.    Defendants aggressively marketed their products to chain stores to give them an advantage with consumers. (09/02/2015 Trial Tr. Morning Session (Borneman) 14:8-15:13.)

69.    Defendants' marketing budget was $7.5 million. (09/08/2015 Trial Tr. Afternoon Session (Le) 66:20-23.)

70.    Defendants' Medical Director, Iris Bell, M.D., did not have $7.5 million to spend on research and development to analyze Defendants' Products to determine whether they were or were not effective. (09/10/2015 Trial Tr. Afternoon Session (Bell) 64:16-18.)

71.    Defendants conceded that they were not selling a placebo as the intended benefit to consumers. (09/02/2015 Trial Tr. Morning Session (Borneman) 75:19-22.)

72.    Defendants through their Products' labels, make promises to their consumers that if consumers buy their products, they will be provided medical relief for various ailments. (09/02/2015 Trial Tr. Morning Session (Borneman) 75:19-22; 09/02/2015 Trial Tr. Afternoon Session (Borneman) 27:19-22; 49:25-50:5; 58:16-19; 83:13-19; 84:1-5; 92:22-25; 102:16-21.)

73.    Plaintiffs were not intending on purchasing a placebo when they purchased Defendants' Products. (09/03/2015 Trial Tr. Afternoon Session (Nigh)

97:20-22; 09/04/2015 Trial Tr. Morning Session (Smith) 20:20-22; 09/04/2015 Trial Tr. Morning Session (Allen) 66:12-23; 09/04/2015 Trial Tr. Morning Session (Sisti) 105:7-17.)

74.    Plaintiffs would not have purchased Defendants' Products if they knew the Products were not effective. (09/03/2015 Trial Tr. Afternoon Session (Nigh) 97:20-22; 09/04/2015 Trial Tr. Morning Session (Smith) 20:20-22; 09/04/2015 Trial Tr. Morning Session (Allen) 66:12-23; 09/04/2015 Trial Tr. Morning Session (Sisti) 105:7-17.)

75.    Defendants' 2014 fiscal sales of their Products was $96,000,000. (09/08/2015 Trial Tr. Afternoon Session (Le) 80:2-5.)

76.    Defendants sold 37,295,014 units of the Products during the class period from February 9, 2008 through February 4, 2015. (Trial Ex. 413.)

77.    Defendants' made $63,279,000 in profit from the sale of the Products. (Trial Ex. 414.).

## III.   CONCLUSIONS OF LAW

78.    The Court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332(d)(2) and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

79.    Venue in the Central District of California is proper pursuant to 28 U.S.C. § 1391(b)(1).

*Plaintiffs Have Met Their Burden in Proving Defendants Violated Business & Professions Code Section 17200 ("UCL")*

80.    Business & Professions Code section 17200 prohibits unfair, unlawful, deceptive or misleading business practices. The UCL is a "is a broad remedial statute that permits an individual to challenge wrongful business conduct 'in whatever context such activity might occur.'" *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (citing *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 561, 973 P.2d 527 (1999)).

13

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

"Each prong of the UCL is a separate and distinct theory of liability; thus, the 'unfair' practices prong offers an independent basis for relief." *Id.* (citing *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861, 85 Cal.Rptr.2d 301, 316–317 (1999)).

81.   "The UCL does not define the term 'unfair' [and] the proper definition of 'unfair' conduct against consumers 'is currently in flux' among California courts." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (quoting Lozano, 504 F.3d at 735).

82.   Some California appellate courts apply a "balancing test," which "requires courts to 'weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" *Weeks v. Google LLC*, No. 18-CV-00801 NC, 2018 WL 3933398, at *14 (N.D. Cal. Aug. 16, 2018) (citing *Davis*, 691 F.3d at 1169). "[P]arties may proceed with a UCL claim under the balancing test by either alleging immoral, unethical, oppressive, unscrupulous, or substantially injurious conduct by Defendants or by demonstrating that Defendants' conduct violated an established public policy." *Id.* (quoting *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 990 (N.D. Cal. 2016)).

83.   "Other California courts apply a 'tethering' test, under which the 'unfairness must be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition.'" *Cappello v. Walmart Inc.*, No. 18-CV-06678-RS, 2019 WL 4051757, at *6 (N.D. Cal. Aug. 26, 2019) (quoting *Lozano*, 504 F.3d at 735 (9th Cir. 2007)). Under the "tethering" test, "parties need not show immoral, unethical, oppressive, unscrupulous, or substantially injurious conduct in order to move forward with a UCL claim. The tethering test only requires parties to show 'that the public policy which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL [is] tethered to specific constitutional, statutory, or regulatory provisions.'" *In re Anthem, Inc. Data Breach Litig.*, 162 F.

14

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  Supp. 3d at 990 (citing *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197,

2  1226 (N.D. Cal. 2014)).

3      84.   "The test applied in a third line of cases draws on the definition of

4  'unfair' in section 5 of the Federal Trade Commission Act (15 U.S.C. § 45, subd.

5  (n)), and requires that '(1) the consumer injury must be substantial; (2) the injury

6  must not be outweighed by any countervailing benefits to consumers or competition;

7  and (3) it must be an injury that consumers themselves could not reasonably have

8  avoided.'" *Phipps v. Wells Fargo Bank, N.A.*, No. CV F 10-2025 LJO SKO, 2011

9  WL 302803, at *16 (E.D. Cal. Jan. 27, 2011) (parallel citations omitted).

10     85.   The Court finds the FTC Section 5 Test, as adopted by the California

11  Court of Appeal in *Camacho v. Automobile Club of Southern California*, 142

12  Cal.App.4th 1394, 1403 (2006), to be persuasive and hereby applies that test to

13  Plaintiffs' claims under the unfair prong of the UCL. *See, e.g., Zuniga v. Bank of

14  America N.A.*, No. Cv 14-06471-MWF, 2014 WL 7156403, at *6 (C.D. Cal., Dec.

15  9, 2014) ("the Court believes that *Camacho* provides the best guidance on the issue

16  and the adapted three-prong FTC Act test should be applied to determine whether a

17  business practice is unfair under the UCL."); *Davis v. Ford Motor Credit Co.*, 179

18  Cal.App.4th 581, 101 Cal.Rptr.3d 697 (2009) ("*Camacho* ... contains an excellent

19  analysis of the issue and we adopt its definition of 'unfair' in consumer cases.");

20  *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 839, 51

21  Cal.Rptr.3d 118 (2006) (adopting the *Camacho* test); *Barriga v. JPMorgan Chase

22  Bank, N.A.*, 2010 WL 1037870, *3 (N.D.Cal. March 19, 2010) (same); *Delacruz v.

23  Cytosport, Inc.*, No. C 11-3532 CW, 2012 WL 1215243, at *10 (N.D. Cal. Apr. 11,

24  2012) ("The Court is persuaded that the California Supreme Court would adopt the

25  *Camacho* approach to unfairness in UCL consumer cases, and thus applies it in this

26  case."); *Walsh v. Bank of Am., N.A.*, No. CV1408114MWFRZX, 2014 WL

27  12589338, at *5 (C.D. Cal. Dec. 10, 2014) ("This Court concludes that in fact the

28  FTC test as articulated in [*Camacho*] should be applied to determine whether a

15

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

business practice is unfair under the UCL."); *Oster v. OneWest Bank, F.S.B.*, No. EDCV1200645MMMRZX, 2013 WL 12248149, at *8 (C.D. Cal. Jan. 16, 2013) ("The appropriate standard for determining whether a consumer has stated a viable claim for relief under the 'unfair prong of the UCL is set forth in [*Camacho*]); *Hensley-Maclean v. Safeway, Inc.*, No. CV 11-01230 RS, 2014 WL 1364906, at *8 (N.D. Cal. Apr. 7, 2014) (adopting the *Camacho* test).

86.    "The factors that define unfairness under the test adopted in Camacho are: (1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Walsh*, 2014 WL 12589338, at *5; *see also Abramson v. Marriott Ownership Resorts, Inc.*, 155 F. Supp. 3d 1056, 1066 (C.D. Cal. 2016) (noting that *Camacho* is the "better test" for claims arising under the unfair prong of the UCL). Applying *Camacho*, the Court finds that Defendants have engaged in unfair conduct.

### Defendants Have Caused Substantial Consumer Injury

87.    "An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people, or if it raises a significant risk of concrete harm.'" *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010), *as amended* (June 15, 2010), *amended*, No. 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010) ["*Neovi*"] (quoting *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 972 (D.C. Cir. 1985)). "Consumer injury can occur in 'a variety of ways.' *F.T.C. v. Amazon.com, Inc.*, 71 F. Supp. 3d 1158, 1164 (W.D. Wash. 2014) (quoting *Neovi*, 604 F.3d at 1156). "While courts should look to any deception on the part of businesses, 'the absence of deceit is not dispositive.'" *Id.* "Nor is actual knowledge on the part of the consumer a requirement to establish substantial harm." *Id.*

88.    As to the homeopathic products at issue, the studies conducted by Dr. Taylor demonstrate Defendants' were falsely advertising their products as effective, knowing the ingredients were not effective. *See Forcellati v. Hylands, Inc.*, Case No.

---

16

2:12-cv-01983-GHK-MRW, Doc. No. 179, at p. 6 ("The CC4K [Cough & Cold 4 Kids] study suggests this theory may be correct as to one of the Class Products. It is reasonable to infer that the theory may be correct as to all the Class Products as well, since they are all prepared using the same homeopathic methods.").

89.     Defendants have caused substantial consumer injury because, contrary to the affirmative statements of effectiveness on the labels, Defendants had not tested their Products for efficacy.

90.     Defendants have caused substantial consumer injury because Defendants had no medical proof their products would relieve symptoms as stated.

91.     Defendants have caused substantial consumer injury because Defendants failed to disclose that the Products are generally comprised of over 99.9% inactive ingredients (189.81 milligrams of lactose and .19 milligrams of ingredients other than lactose).

92.     Defendants have caused substantial consumer injury because Defendants did not inform consumers, including Plaintiffs, that the Products were manufactured through dilutions.

93.     Defendants have caused substantial consumer injury because the evidence shows that the products are only effective as placebos and marketing a product that merely provides relief as a placebo is an unfair business practice. *F.T.C. v. Pantron I*, 33 F.3d 1088, 1096; 1100 (9th Cir. 1994) ["we hold that the Federal Trade Commission is not required to prove that a product is "wholly ineffective" in order to carry its burden of showing that the seller's representations of product efficacy are "false." Where, as here, a product's effectiveness arises solely as a result of the placebo effect, a representation that the product is effective constitutes a "false advertisement" even though some consumers may experience positive results."]; *F.T.C. v. Direct Marketing Concepts, Inc.* (D. Mass. 2008), 569 F.Supp.2d 285, 298 aff'd, (1st Cir. 2010).

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

94.     Defendants have caused substantial consumer injury by failing to disclose to consumers, including Plaintiffs, that (1) there is no scientific evidence that the products work and (2) the Products' claims are based only on theories of homeopathy from the 1700s that are not accepted by most modern medical experts. *See* FTC's Enforcement Policy Statement on Marketing Claims for OTC Homeopathic Drugs.

95.     Accordingly, the Court finds that Plaintiffs have met their burden of showing substantial consumer injury.

### *The Injury is Not Outweighed by Countervailing Benefits to Consumers*

96.     The Court finds that Defendants' misrepresentations and omissions about the Hyland's products provides no benefits to consumers let alone countervailing benefits that outweigh the substantial consumer injury.

97.     Defendants conducted no pharmacological analysis in developing the Products and Defendants' marketing department made the decision on the "active" ingredients for the Products.

98.     Defendants' motivation for selling the Products was not to benefit consumers, but rather to increase its own profits. (Tr. Ex. 357-1, "Skip your way to the bank with Hyland's. Hyland's fast selling homeopathic OTC's can help to increase sales and profits in your Analgesics assortment.")

99.     Accordingly, the Court finds that Plaintiffs have met their burden of showing that the substantial consumer injury is not outweighed by countervailing benefits to consumers.

### *Consumers Could Not Have Reasonably Avoided the Injury*

100.    "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *Neovi*, 604 F.3d at 1158.

101.   The Court concludes that Plaintiffs and the Class Members in this case did not have a "free and informed choice" when purchasing the Products because Defendants did not adequately disclose material information about the Products.

102.   The FTC sent a letter to Defendants stating that it was concerned that "consumers may not distinguish between homeopathic products and allopathic dietary supplement products." (Tr. Ex. 399-1.) A focus group conducted by the FTC also suggests that "there is a poor understanding of the principles underlying homeopathic products." (Tr. Ex. 406-11.) The FTC study also found that consumers have "very little understanding and knowledge of the underlying principles" of homeopathy and that consumers are generally unfamiliar with the dilution levels of homeopathic products such as the Hyland's products. (Tr. Ex. 406-51.)

103.   The 2016 FTC Enforcement Policy Statement also requires that homeopathic products effectively communicate to consumers that "(1) there is no scientific evidence that the product works and (2) the product's claims are based only on theories of homeopathy from the 1700s that are not accepted by most modern medical experts." Moreover, "perfunctory disclaimers are unlikely to successfully communicate the information necessary to make claims for OTC homeopathic drugs non-misleading." The FTC notes that "[a]ny disclosure should stand out and be in close proximity to the efficacy message; to be effective, it may actually need to be incorporated into the efficacy message" and that "[m]arketers should not undercut such qualifications with additional positive statements or consumer endorsements reinforcing a product's efficacy." Here, none of the Hyland's products have disclosures that satisfy these FTC requirements.

104.   The Court further finds that Defendants have failed to disclose other material information about the Products, including: (1) the meaning of the dilution levels; (2) identification of product ingredients in Latin which is inherently misleading (i.e. the use of "naturum muriaticum" to identify salt); (3) that the FDA does not test the products for efficacy even though certain of Defendants'

19

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

competitors do disclose this fact; (4) that randomized clinical tests on two of its products demonstrated the products did no better than, and in one case worse than, a placebo; (5) that it made no difference how much of the product you used and that it was virtually impossible to overdose on the products; (6) that Defendants conduct no tests prior to releasing their products to determine whether they are effective, despite advertising the products as "effective."

105.   Accordingly, the Court finds that the consumer injury could not have been reasonably avoided because consumers were not given a "free and informed" choice when purchasing the Products.

### *Equitable Monetary Relief*

106.   A finding of a violation of Business & Professions Code section 17200 provides equitable remedies for Plaintiffs, including disgorgement of profits from the Defendants' wrongdoing. *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 173 (2000) ["a UCL action is equitable an equitable action by means of which a plaintiff may recover money…obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices."].

107.   Even if some consumers may have received some relief in the form of the placebo effect, that healing, achieved under false pretenses, does not enure to the benefit of a defendant who does not so inform their consumers. *See F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1100 (9th Cir. 1994) ("Where, as here, a product' effectiveness arises solely as a result of the placebo effect, a representation that the product is effective constitutes a 'false advertisement' even though some consumers may experience positive results. In such circumstances, the efficacy claim 'is "misleading" because the [product] is not inherently effective, its results being attributable to the psychosomatic effect produced by the advertising and marketing of the [product],' . . . . Moreover, allowing advertisers to rely on the placebo effect would not only harm those individuals who were deceived; it would create a

20

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

substantial economic cost as well, by allowing sellers to fleece large numbers of consumers…").

108.   Defendants' violations of Business & Professions Code section 17200 warrant disgorgement of their profits they realized because of their unlawful business practice and fraudulent advertising.

109.   Disgorgement of Defendants' profits can be ascertained by calculating the number of units sold by the profits obtained. Defendants' profits can be and were reasonably calculated based on Defendants' identification of costs of goods per Product.

110.   The Court finds Defendants realized the following profits per Product during the class period relying on Plaintiffs' expert testimony presented by Mr. Ackerman (Trial Ex. 414):

| | |
|---|---|
| **a**. Calms Forte: | $ 9,045,193.00 |
| **b**. Teething Tablets: | $22,898,592.00 |
| **c.** Migraine Headache Relief: | $ 574,947.00 |
| **d**. Colic | $ 1,010,308.00 |
| **e**. Defend Cold & Cough Night: | $ 374,180.00 |
| **f**. Defend Cold & Cough: | $ 869,268.00 |
| **g**. Leg Cramps: | $27,385,076.00 |
| **h**. Hyland's Cough: | $ 98,718.00 |
| **i**. Seasonal Allergy Relief: | $ 1,022,519.00 |

*Equitable Injunctive Relief*

111.   The UCL provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203. Injunctive relief is the "primary remedy" available to consumers for violations of California's consumer protection laws. *See McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 951 (2017); *see also In re Tobacco*

21

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

*II Cases*, 46 Cal. 4th 298, 319 (2009) ("the primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction, along with ancillary relief in the form of such restitution...").

112.  The Court finds that injunctive relief is appropriate in this case. Accordingly, the Court hereby enjoins Defendants from marketing and selling the Hyland's products at issue unless the Products contain a clear and conspicuous disclosure on the front of the label stating that (1) there is no scientific evidence that this Product works and (2) the Product's claims are based only on theories of homeopathy from the 1700s that are not accepted by most modern medical experts.

## IV.  <u>CONCLUSION</u>

113.  All of the foregoing constitutes the Court's findings of fact and conclusions of law.

114.  Within ninety days of this Order, Plaintiffs shall submit a supplemental brief to the Court outlining a plan for providing notice to the class members of the Court's Judgment and a plan for distribution of funds to the class members. Plaintiffs' may also submit a Motion for Attorneys' Fees, Costs, and Incentive Awards.

Dated: _____, 2019          _____
                                      Honorable Dolly M. Gee
                                      United States District Judge

1 Submitted by,

2

3

4  DATED:      October 2, 2019           Respectfully submitted,

5

6                                       */s/ Ronald A. Marron*
                                        RONALD A. MARRON
7

8                                       **LAW OFFICES OF**
                                        **RONALD A. MARRON**
9                                       RONALD A. MARRON
10                                      *ron@consumersadvocates.com*
                                        Michael T. Houchin
11                                      *mike@consumersadvocates.com*
12                                      651 Arroyo Drive
                                        San Diego, California 92103
13                                      Telephone: (619) 696-9006
14                                      Facsimile: (619) 564-6665
15

16                                      **NELSON & FRAENKEL LLP**
                                        GRETCHEN M. NELSON
17                                      *gnelson@nflawfirm.com*
18                                      601 So. Figueroa Street, Suite 2050
                                        Los Angeles, California 90017
19                                      Telephone: (213) 622-6469
20                                      Facsimile: (213) 622-6019
21

22                                      **GOMEZ TRIAL ATTORNEYS**
                                        JOHN H. GOMEZ
23                                      *jgomez@gomeztrialattorneys.com*
                                        DEBORAH S. DIXON
24                                      *ddixon@gomeztrialattorneys.com*
25                                      655 W. Broadway Suite 1700
                                        San Diego, California 92101
26                                      Telephone: (619) 237-3490
27                                      Facsimile: (619) 237-3496
                                        ***Class Counsel***
28

*Kim Allen, et al. v. Hyland's, Inc., et al.*, No. 12-cv-1150-DMG-MAN
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW